Wolohojian, J.
The plaintiff, Dr. Bernard Bulwer, an experienced physician and a black man from Belize, became a first-year resident at Mount Auburn Hospital (hospital) in August, 2005. He joined the residency program under a one-year contract, with the possibility of advancement to a second year of residency upon successful completion of the first. Eight months into the program, he was told that the hospital would not extend a second-year contract to him but that he would be allowed to continue his residency through the end of his first year. One month later, however, he was terminated. This suit followed, in which Bulwer alleges discrimination and retaliation based on his race and national origin in violation of G. L. c. 151B, breach of contract, defamation, and tortious interference with his contractual relationship with the hospital.[3] Summary judgment entered in favor of the defendants on all counts. We conclude that the summary judgment record sufficed to entitle Bulwer to have a jury decide his discrimination and breach of contract claims, but that sum *318 mary judgment was properly entered on his remaining claims. Accordingly, we affirm in part and reverse in part.
1. The summary judgment record. In reviewing a grant of summary judgment, we assess the record de nova and take the facts, together with all reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. Godfrey v. Globe Newspaper Co., 457 Mass. 113, 119 (2010). “[T]he court does not pass upon the credibility of witnesses or the weight of the evidence [or] make [its] own decision of facts.” Shawmut Worcester County Bank, N.A. v. Miller, 398 Mass. 273, 281 (1986), quoting from Attorney Gen. v. Bailey, 386 Mass. 367, 370 (1982). Viewing the facts in this light, we then determine whether the moving party has affirmatively shown that there is no real issue of fact, “all doubts being resolved against the party moving for summary judgment.” Ibid. The record at hand, viewed with these principles in mind, showed the following.
a. Bulwer’s background and the hospital’s residency program. Bulwer is a black male of African descent whose nation of origin is Belize. In the spring of 2005, he contacted the hospital to inquire about a possible position in its internal medicine residency program. The director of the program, Dr. Eric Flint, interviewed Bulwer and believed him to be personable and capable. Flint followed up on the interview by verifying Bulwer’s previous professional experience and confirming that he had performed satisfactorily at those positions. Based on his favorable impressions and the satisfactory results of his due diligence, Flint recommended that Bulwer be accepted into the program.
Bulwer was not a typical applicant to the hospital’s residency program because he was already an experienced physician. Before joining the program, Bulwer had sixteen years of professional experience as a physician, and had certified postgraduate specialist training in nutrition, diabetes and metabolic medicine, cardiovascular disease, and echocardiography. He had authored or coauthored three books, and had over forty scientific publications.
The first year residency program typically consists of twelve one-month rotations, and there are forty-two residents in the program in any given year. The program is accredited by the Accreditation Counsel for Graduate Medical Education (ACGME) *319 and governed by that organization’s requirements. As pertinent here,[4] the ACGME required that:
“e. Conditions for reappointment;
“(1) Nonrenewal of agreement of appointment: [The hospital] must provide a written institutional policy that conforms to the following: In instances where a resident’s agreement is not going to be renewed, [the hospital] must ensure that its ACGME-accredited programs provide the resident(s) with a written notice of intent not to renew a resident’s agreement no later than four months prior to the end of the resident’s current agreement. However, if the primary reason(s) for the nonrenewal occurs within the four months prior to the end of the agreement, [the hospital] must ensure that its ACGME-accredit-ed programs provide the residents with as much written notice of the intent not to renew as the circumstances will reasonably allow, prior to the end of the agreement. “(2) Residents must be allowed to implement the institution’s grievance procedures as addressed below if they have received a written notice of intent not to renew their agreements.
“f. Grievance procedures and due process: [The hospital] must provide residents with fair and reasonable written institutional policies on and procedures for grievance and due process. These policies and procedures must address
“(1) academic or other disciplinary actions taken against residents that could result in dismissal, nonrenewal of a resident’s agreement or other actions that could significantly threaten a resident’s intended career development; and,
“(2) adjudication of resident complaints and grievances related to the work environment or issues related to the program or faculty.”
*320 Bulwer entered into a one-year medical resident agreement (agreement) with the hospital covering the period of August 29, 2005, to August 28, 2006. The agreement provided that the hospital agreed to comply with the ACGME requirements. As noted above, one of those requirements was that the hospital have written grievance and due process policies, which it did. Certain of those policies are relevant to Bulwer’s claims, and we set them out here:
“4----In instances where a resident’s agreement is not going to be renewed, the training program will provide the resident with written notice of intent not to renew a resident’s agreement no later than four months prior to the end of the agreement. . . . Residents are allowed to implement the due process procedure as addressed below if they have received a written notice of intent not to renew their agreements.
“II. Due Process Procedures:
“Upon request by a resident, program director, member of the teaching staff, administration or patient for review of an issue under the scope of this policy an Ad Hoc Committee will be assembled.
“Composition:
“The Ad Hoc Committee will be composed of the ACGME Designated Institutional Official/Director of Medical Education, the Chairs of the Departments of Medicine and Radiology, the Program Directors of the training programs in Medicine and Radiology, the houseofficer, and a houseofficer representative that is mutually agreed upon by the Director of Medical Education and the houseofficer under discussion.
“Fair Hearing:
“The resident is assured of the fundamental aspects of a fair hearing including written statement of the specific issues from the Department Chair, at least 5 days notice of the Due Process Committee meeting, the opportunity to be present and to rebut the evidence, and the opportunity to present any other information.
*321 «
« “All matters upon which any decision is based must be introduced into evidence at the proceeding before the Ad Hoc Due Process Committee in the presence of the resident. . . . Appeal of the decision of the hearing is limited to matters introduced at the hearing and made available to the resident.”
b. Bulwer’s performance in the program. Under this contractual framework, Bulwer began his residency. His first rotation was in the emergency department, where he received strong evaluations. For example, at least two physicians evaluated Bulwer as “outstanding” during this rotation, and commented that “Dr. Bulwer... knows more cardiology and has better echo skills than I do, [is] professional, enthusiastic, [gives] great presentations, [and is a] pleasure to work with.” Five others rated him “above average,” commenting that he was “knowledgeable, responsible, [and had a] pleasant demeanor[, and excellent work ethic,” that he was “very good, works hard [and is] excited to be at work and looks to improve every shift,” that he “[w]arks hard[, is a] [w]onderful person[, and g]reat with patients and staff,” and that he is“ [v]cry knowledgeable, extremely hardworking and conscientious [, and h]as great rapport with fellow physicians and staff.”[5] He was assessed to be mature and a pleasure to work with. Significantly, Dr. Gary Setnik, head of the emergency department, in response to a request that he assess Bulwer’s performance over a period of months in the emergency department, wrote:
“Dr. Bulwer is universally held in high regard by the staff I polled and by myself. He has been totally reliable, coming in early, and staying late on most shifts. He aggressively works to see as many patients as possible. His presentations are complete, his management plans appropriate, and his procedural skills very good. Aside from some very minor documentation issues, and his failure to assure that the admitting resident was called on one case, his performance has been outstanding. He is in the top 10% of the medical house-officers who have rotated in the E[mergency] Department] over the last several years.”
By contrast, Bulwer’s evaluations during his next rotation through the medicine intensive care unit (MICU) were not of the *322 same sort. In that rotation, he received three strongly negative evaluations. That said, the assessment of Bulwer’s performance in the MICU was not uniform. Dr. Soon-11 Song reported a positive view of Bulwer’s performance in the MICU:
“His strengths were that he had procedural skills and knowledge base well above someone at an intern level. He also was pleasant to work with. He had a good sense of his own limitations, and asked questions often in order to clarify issues. I think his ability to gather information in history taking was quite good and thorough. Above all, he maintained composure and a good attitude, despite the fact that we had an especially difficult night of no sleep and challenging patients requiring multiple attending input in the middle of the night.”
During October of 2005 (the same month of Bulwer’s MICU rotation), the first-year residents at the hospital (like other first-year residents nationally) were required to take a national standardized test designed to test their medical knowledge relative to their peers. Bulwer scored in the top one-third nationally on that test, and his results were consistent with those of his peers at the hospital.
On October 26, 2005, Bulwer sent an electronic mail message (e-mail) to Flint, the director of the internal medicine residency program, to address the negative comments Bulwer had received during his MICU rotation. Bulwer did not believe those reviews were objective and asked Flint to obtain a more objective view of his performance by speaking with the physicians with whom he had actually seen patients: Drs. Hayat, Song, Tillinger, and Brady-Joyce. Flint did not speak with any of those individuals, even after Bulwer again expressed to Flint he felt that he was not being assessed objectively.
Bulwer was not alone in this view of the MICU’s evaluation of his performance. Setnik, the chair of the emergency department, reported that the MICU team was unnecessarily critical of Bulwer and also that the MICU staff had harshly attacked members of the emergency department for favorably evaluating Bulwer’s performance:
“It was about the same time that he was having difficulty in the [MICU] that we were criticized very heavily by members of the [MICU] team, and when I say we I mean the entire *323 E[mergency] Department] staff, and some of them unbelievably harshly. An experience that I hadn’t previously had at Mount Auburn, to be honest with you and I have collected the emails and I could share them with you, but they are really quite harsh, and that led to a whole series of other discussions that we had and a reflection about maybe thinking that [Bulwer] had entered an area that was going to be a little bit more critical than it needed to be for a person in his circumstances, just and not having had clinical medicine for a while and the like.”
On November 15, 2005, Dr. Lori Balestrero (who was Bulwer’s adviser for the residency program) met with him to discuss the feedback received on his performance in the MICU rotation. Bulwer again responded that he did not believe that the feedback was accurate. On December 1, 2005, Balestrero again met with Bulwer, after having met with the clinical competence committee (CCC) to identify areas in which Bulwer needed to improve. These areas were presented as part of a six-point plan that included meeting with his adviser weekly to review Bulwer’s progress. Those meetings did not occur. Similarly, although the action plan called for a follow-up meeting between Bulwer, Balestrero, and a CCC representative after the December evaluations were received, that meeting too did not occur.[6]
Bulwer next rotated into “wards,” where several evaluations of his performance were on the whole positive, although they also noted some areas of weakness. One such evaluation read, “Great job! Very bright/knowledgeable. Be concise, people get lost sometimes lo[ ]sing the big picture of the story you are telling. Much improvement seen!” Song, who supervised Bulwer directly, gave the following detailed assessment of Bulwer’s performance during his wards rotation, responding specifically to the areas of concern raised during the MICU rotation:
“1____Bernard’s ability to interpret and analyze clinical data,
and formulating a plan of management is excellent and in the 10% of the intern class. His presentations on wards work rounds are methodical, to the point, and effective.
“2. ... He has a good sense of humor and speaks even of *324 those who have criticized, him with respect. The main issue here I think is that his behavior has been misconstrued in the past as arrogance in his zeal to impart instruction. However, he has demonstrated nothing but caring, concern, and team spirit this month on wards. His interactions with nursing and patients in my observation demonstrated no serious deficiencies requiring me to give feedback to him.
“3. ... I have been mindful when I visit Bernard’s patients to assess their subjective and emotional responses to his presence in the room. These are the more intangible things which may be difficult to quantify, but at no time have I sensed tension on the part of Bernard’s patients toward him. I have on several occasions observed him interacting with patients when he was initially unaware of my presence and I have come to the same conclusion. It is difficult for me to understand past allegations in this regard, and if true, certainly do not leave their residue today.
“4. ... In honesty, there are a few times when I felt the need to give constructive criticism to Bernard. I believe the manner in which feedback is given is important with any scenario. I get the impression that Bernard may be sensitive to feedback given in a humiliating manner. My approach has been to give feedback in the spirit of gentleness, and of emphasizing ensuring] of proper patient care. With this approach, I have had no problems with Bernard, as I interact with him as one professional colleague to another, and he understands this approach as my particular style.
“In sum, Bernard has areas of weakness and strength as any other intern. But as an intern, I have seen residents with far less clinical acumen and interpersonal skills graduate from the program.”[7]
By contrast, Dr. Erica Bial considered Bulwer’s performance during his wards rotation to be “horrendous.” There is evidence in the record, however, to suggest that Bial had acted inappropriately towards Bulwer, including berating him in public in an *325 inappropriate way, with her “voice raised and . . . speaking continuously” without permitting Bulwer to respond.
When Bulwer met with his adviser, Balestrero, on January 18, 2006, to review his progress, she stated that he had received good reports and that “the past [was] behind [him].” This was the first and last meeting Balestrero had with him concerning his progress after December 1, 2005, when he had been told he would have weekly progress meetings with her.
Bulwer next rotated into cardiology, where two reviewers gave him highest marks, and one reviewer gave him mixed marks. The only narrative review provided for that month read:
“[Bulwer] worked well [with] team this month. He repeatedly brought in articles to support his presentations & teach team. This is very commendable. Could have a little more poised presentations (ie: why is p[atien]t in the hospital]/ what’s keeping him/her here?). Cardiology knowledge base is excellent! Would encourage T [greater] communication [with] nurses to make sure everyone is in the loop.”
Outside of these rotations, Bulwer also received favorable reviews for his performance in the continuity clinic and from Dr. Ramona Dvorak, the director of consultation-liaison psychiatry at the hospital:
“I have been impressed with Dr. Bulwer’s thorough knowledge of the medical issues arising with his patients. He always gives me a complete, well organized and well thought out presentation of the case. He puts forth a psychological formulation of his impressions or concerns that demonstrate an astute integrative style in which he considers many levels of the patient’s situation. I have always found him to be extremely engaging, personable, open, extremely bright, articulate and willing to learn. He is verbal, active in teaching rounds, and brings up sensitive and essential cultural and psychosocial issues that many trainees at his level do not consider when thinking of patients. He is an independent thinker, yet I have found him to take in feedback well and add an interesting personal and cultural dimension to patient care. I feel that his unique cultural and clinical background has enriched learning experiences with his peers and with patient care that has made an important contribution to the Mount Auburn Hospital milieu.”
*326 c. Adverse employment actions and Bulwer’s appeal from them. On March 17, 2006, Flint told Bulwer that he would not be promoted because his work was not up to the standard required of a first-year resident in the areas of patient care, especially complex cases, and communication around cases. Bulwer questioned the quality of the feedback on which the decision was based and wanted to acquire additional points of observation, and a follow-up meeting was scheduled for the next week.
On April 5,2006, Bulwer was formally notified by Flint that his contract would not be extended for a second year because of concerns in the areas of patient care, interpersonal and communication skills, and practice-based learning (i.e., the ability to gain insight from feedback). These concerns were based on observations “some of which have been documented and some of which have not.”
Bulwer was informed of his right to appeal the decision under the ACGME requirements, and he was provided with a copy of the hospital’s “Houseofficer Evaluation/Grievance/Due Process Policy” which contained the provisions set out above. Bulwer invoked his right to appeal and, as a result, an ad hoc appeal committee (ad hoc committee) was established. That committee met and deliberated on three occasions, April 24, May 2, and May 9, 2006. Bulwer was present only at the first; he was not invited to attend the second and third days of the hearing, nor did he receive any of the materials submitted those days despite his request. Extensive — and important — testimony concerning his performance was heard during the second and third sessions. For example, Balestrero testified extensively during the second day of the hearing, and the ad hoc committee members’ discussion after her testimony demonstrates that it affected their view of the case. The ad hoc committee also heard from Dr. Carey Thomson and from Setnik, who both gave substantive evaluations of their experiences working with Bulwer, and from Dr. Ricardo Well-isch, chair of the CCC, who did the same. The evidence before the ad hoc committee was not uniformly critical of Bulwer, and indeed, there was some praise of his work. At the end of the second day of the hearing, Dr. Charles Hatem, the chair of the ad hoc committee, commented that “it is interesting how one set of behaviors can elicit such different perception,” and he determined that additional discussion and thought would be necessary to reach a conclusion about Bulwer.
The record does not contain a transcript of the third ad hoc committee meeting. However, after the third session, the ad hoc *327 committee confirmed the decision of the CCC not to extend Bulwer’s contract for a second year for the same reasons articulated by Flint,[8] and a letter dated May 17, 2006, from Dr. Stephen Zinner, chair of the department of medicine, so informed Bulwer.
Also on May 17, the hospital terminated Bulwer, effective immediately, for
“serious additional concerns about his performance [that] have arisen over the past 3 weeks while his review was in progress[.] Dr. Flint made the decision that in the interest of patient safety at Mount Auburn Hospital, Dr. Bulwer should be immediately relieved of his responsibilities as a medical intern.”
The record does not reflect that immediate termination was ever formally made a part of the ad hoc committee process or that the additional patient safety issues were discussed by that committee. (No mention of them is in the transcripts of the first or second sessions). Instead, the decision to terminate Bulwer was made after the last meeting of the ad hoc committee. Indeed, the hospital admits that Bulwer was never informed that the ad hoc committee was considering terminating him due to alleged patient safety risks. The hospital also admits that the first Bulwer learned of this possibility was when he was notified of his termination.
d. Posttermination events. On May 17, 2006, Flint sent a mass e-mail to employees of the hospital informing them that Bulwer had been terminated. He concluded the e-mail: “The decision was clear. Yet the need to take this action was most unfortunate and the consequences for Dr. Bulwer’s future are large. I wish him the best in his future endeavors and I hope he finds a career path that is best suited to his strengths.”
The next day, Flint sent another group e-mail, this time to all residents:
“Some of you may have heard that Bernard Bulwer is no longer working with us in our program, so I wanted to offer a few words regarding this.
“The Clinical Competence Committee (CCC, made up of all the docs that serve as advisors) meets from time to time *328 to review performances of all residents. Over the winter, the issues regarding Dr. Bulwer were discussed and shared with him in a way that was supportive and geared towards allowing him to use the feedback constructively to improve. After a time, with no improvement noted in key areas, a decision was made not to continue him in the program.
“According to our program’s policy and in accordance with ACGME requirements, Dr. Bulwer appealed this decision. An ad hoc committee chaired by Dr. Hatem and including members of other departments reviewed the CCC concerns, allowed Dr. Bulwer to offer his perspective and supporting materials, reviewed his records and patient care activities to date, and after all that decided to support the CCC decision not to continue him in the program.
“The decision was clear. There was much deliberation both by the CCC and during the appeals process. It is difficult to take this action because of the consequences for Dr. Bulwer going forward. I personally and on behalf of all the staff in the Department of Medicine wish him success in the future in a career path best suited for his strengths.”
The hospital also reported Bulwer’s termination to the Board of Registration in Medicine. The hospital did not give patient safety as its reason for the termination; instead, it represented that Bulwer had been terminated for “[fjailure to make appropriate progress in processing and applying evaluations and other constructive criticism and feedback to patient care responsibilities.”
We reserve additional facts to the discussion below.
2. Discussion. We review a grant of summary judgment de nova, with “no deference to the decision of the motion judge.” DeWolfe v. Hingham Centre, Ltd., 464 Mass. 795, 799 (2013). The defendants, as the moving parties, “have the burden of establishing that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law.” Ibid. The moving party may satisfy its burden by demonstrating that the opposing party has no reasonable expectation of proving an essential element of the case at trial. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). “Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a material fact in order to defeat the motion.” SCA Servs., Inc. v. Transportation Ins. Co., 419 Mass. 528, 531 (1995).
*329 a. Discrimination claim. “In employment discrimination cases alleging disparate treatment, we allocate the burden of producing evidence according to the framework set forth by the United States Supreme Court under the Federal antidiscrimination provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. (1994). Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of racial discrimination. Once the plaintiff meets this burden, unlawful discrimination is presumed. The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its hiring decision, and to produce credible evidence to show that the reason or reasons advanced were the real reasons. The defendant’s burden of production is not onerous. The reasons given for a decision may be unsound or even absurd, and the action may appear arbitrary or unwise, nonetheless the defendant has fulfilled its obligation. The defendant is not required to persuade the fact finder that it was correct in its belief. Once the defendant meets its burden, the presumption of discrimination vanishes, and the burden returns to the plaintiff to persuade the court, by a fair preponderance of the evidence, that the defendant’s proffered reason for its employment decision was not the real reason, but is a pretext for discrimination. The plaintiff bears the burden of persuasion on the ultimate issue of discrimination, and therefore must produce evidence sufficient to support a jury verdict that it was more likely than not that the articulated reason was pretext for actual discrimination. If the defendant’s reasons are not discriminatory, and if the plaintiff does not prove that they are pretexts, the plaintiff cannot prevail.” Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 127-128 (1997) (quotations and citations omitted).
Our standard of review in discrimination cases based on disparate impact is the same as in any other summary judgment case. Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 38-39 (2005). And, as in all other types of cases, the defendant, “as the moving party, ‘has the burden of affirmatively demonstrating the absence of a genuine issue of material fact on every relevant issue, even if [the defendant] would not have the burden on an issue if the case were to go to trial.’ ” Id. at 39, quoting from Matthews v. Ocean Spray Cranberries, Inc., 426 Mass, at 127.
The hospital accepted, for purposes of summary judgment, that Bulwer had met his burden of demonstrating a prima facie case of discrimination. And Bulwer does not seriously argue that the hospital failed to meet its non-onerous burden of articulating a *330 legitimate reason for his termination.[9] In other words, the first two steps of the burden-shifting framework are not at issue.
Instead, the issue is whether the hospital met its burden of establishing that there is no genuine issue of fact concerning pretext.[10] See Pederson v. Time, Inc., 404 Mass. 14, 17 (1989) (“The party moving for summary judgment assumes the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue, even if he would have no burden on an issue if the case were to go to trial”). See also DeWolfe v. Hingham Centre, Ltd., 464 Mass, at 799. Put another way, the defendant is entitled to summary judgment only if “the summary judgment record demonstrates that the defendant has shown that the plaintiff will be unable to prove at trial that the stated reason for terminating him was a pretext.” Matthews v. Ocean Spray Cranberries, Inc., 426 Mass, at 129. Pretext, like other inquiries into the minds and motivations of individuals, is generally not appropriate for disposition on summary judgment. See Blare v. Huslcy Injection Molding Sys. Boston, Inc., 419 Mass. 437, 439 (1995), citing Brunner v. Stone & Webster Engr. Corp., 413 Mass. 698, 705 (1992).“Summary judgment is generally disfavored in cases involving employment discrimination because the question of intent requires a credibility determination.” Godfrey v. Globe Newspaper Co., 457 Mass, at 119. See also Matthews v. Ocean Spray Cranberries, Inc., 426 Mass, at 127; Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000) (“[Cjourts should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent”). “[Sjummary judgment is disfavored in discrimination cases based on disparate treatment because the question of the employer’s state of mind (discriminatory motive) is ‘elusive and rarely established by other than circumstantial evidence’ ” (footnote omitted). Sullivan v. Liberty Mut. Ins. Co., 444 Mass, at 38, quoting from Blare v. Husky Injection Molding Sys. Boston, Inc., supra.
*331 There was sufficient evidence of pretext to withstand the defendants’ summary judgment motion in this case. Although there was certainly ample evidence that Bulwer’s performance in the residency program fell short of expectations, there was also evidence that he performed well. There was no dispute that he was a well-trained physician coming into the program, or that his fund of medical knowledge was sufficient. His problems appear to arise in areas of performance less susceptible to objective measurement: communication, ability to process criticism, and manner (whether with patients or staff). There is room for much subjectivity when evaluating these areas.[11] And it is particularly appropriate that a jury decide whether that subjectivity included racial bias given, for example, that Setnik, the chair of the emergency department, reported that he and members of his department thought that Bulwer was being criticized unfairly. He also testified that physicians who reviewed Bulwer favorably were treated harshly, behavior that was unprecedented at the hospital.
When Bulwer was informed of the criticisms against him, he repeatedly asserted that they were not objective and that other physicians with whom he worked should be asked their views. Flint did not follow up with those physicians. There was also evidence that Bial, who had a particularly negative view of Bulwer’s performance, harbored animosity toward him and had behaved inappropriately toward him in public.
Moreover, there was evidence that Bulwer was not given the same remediation opportunities as other first-year residents who struggled in the program. Others were permitted to repeat rotations or to repeat the full year. Similarly, although the hospital gave Bulwer a six-point improvement plan that included weekly meetings with his adviser, those meetings never occurred. Dvorak’s observation over her lengthy career at the hospital was “that non-minorities who have significant performance or behavioral issues in the institution ... are given support, where people of color, in my opinion, have been treated much more harshly.”
More broadly, Dvorak described “institutional racism” at the hospital. She described “white supremacist doctrine” left in the staff room, and that the hospital administration took inadequate *332 action in response. She testified that a bumper sticker she had on her office door that read, “We are all one people in the world,” was torn off, as was another that expressed a similar support of diversity. She testified that during her lengthy tenure at the hospital only two black physicians remained. The weight and credibility of Dvorak’s testimony is clearly the province of the jury, not ours.
There is also evidence of how other residents fared in the program. The hospital typically has forty-two residents in any given year. Since 2000, three residents have been terminated from the program. Two were of African descent; one was Caucasian. In addition, “the hospital admits that another intern of African descent did not continue in the program.”[12] It is for the jury to decide whether the fact that two-thirds of the terminated residents are of African descent is a pattern from which discriminatory animus can be inferred in the termination of Bulwer.[13] Numeric evidence of how other members of the class fared at the hospital “are relevant, and may be properly introduced in a disparate treatment case .. . because .. . they may support an inference that the particular decision was tainted by an unlawful bias.” Lipchitz v. Raytheon Co., 434 Mass. 493, 509 (2001). See Smith College v. Massachusetts Commn. Against Discrimination, 376 Mass. 221, 228 n.9 (1978) (statistical evidence can be probative on question of motive). See also Sullivan v. Liberty Mut. Ins. Co., 444 Mass, at 46 n.16 (numeric evidence concerning composition of employees who were terminated “may help establish a prima facie case of discrimination, even in a disparate treatment case”).
Irregularities in the ad hoc committee process could support an inference that it was not fair or that Bulwer was treated in an *333 unusual fashion from which pretext could be inferred. As discussed in more detail below, the hospital did not abide by its own rules or those required by the ACGME with respect to the review process. Of particular significance, Bulwer was not allowed to be present for two of the three ad hoc committee meetings, and was not provided with the materials from those meetings despite his request. He was never informed that the ad hoc committee was considering terminating him for an issue relating to patient safety or given an opportunity to address or rebut the criticisms of his performance with respect to the patient at issue. Song, who tried to convey his positive view of Bulwer’s performance to Flint, received the impression from Flint that “the train had already left the station” and that positive feedback about Bulwer would not make a difference.
Finally, shifting explanations for the hospital’s actions could also support an inference of pretext. The hospital’s position in the statement of undisputed facts on summary judgment was that it did not promote Bulwer because of “poor performance in the internal medicine department.” Its “reason for immediately terminating Bulwer from employment that day was risk to patient safety.” This, however, was not the reason the hospital gave to the Board of Registration in Medicine in a report the hospital was required by law to file within thirty days of Bulwer’s termination. See G. L. c. Ill, § 53B. Instead, the hospital stated that Bulwer was terminated because he “[f]ail[ed] to make appropriate progress in processing and applying evaluations and other constructive criticism and feedback to patient care responsibilities.”[14] In short, when the summary judgment record is taken in the light most favorable to Bulwer, Drakopoulos v. U.S. Bank Natl. Assn., 465 Mass. 775, 777 (2013), without evaluating the credibility of witnesses or the weight of the evidence, McGuinness v. Cotter, 412 Mass. 617, 628 (1992), the record was sufficient to put the discrimination claim to the jury.
b. Breach of contract. Bulwer argues that the hospital breached its contractual obligations to him by (a) failing to comply with the ACGME’s nondiscrimination requirement;[15] (b) failing to include a resident on the ad hoc committee, as required by the hospital’s *334 written due process procedures; (c) failing to provide him with advance notice of specific patients or allegations considered by the ad hoc committee; (d) failing to provide him with required resources and supervision; and (e) failing to provide him with an appeal from the ad hoc committee decision. There was sufficient evidence in the summary judgment record to support each of these arguments, with the exception of the last.[16]
First, the evidence supporting Bulwer’s G. L. c. 151B discrimination claim as set forth above is, for the same reasons, sufficient to support his claim that the hospital breached the ACGME nondiscrimination policy. See note 4, supra. Second, it is undisputed that the ad hoc committee did not include a resident member as required by the hospital’s due process policy. Third, it is undisputed that Bulwer did not receive any notice that the ad hoc committee was considering his immediate termination, nor does the record show that he was provided any of the information concerning the patient whose care precipitated the hospital’s decision to terminate him immediately. Instead, Bulwer was informed that the decision to terminate him was based on “additional” information that came to light during the review process, and there is no indication that that information was disclosed to Bulwer before his termination or that it was discussed during any of the three meetings of the ad hoc committee. Indeed, the decision to terminate Bulwer immediately was made after the third and final meeting of the ad hoc committee, and was communicated by Zinner (chair of the department of medicine) to Flint. Bulwer’s requests for materials considered during the second and third meetings of the ad hoc committee went unanswered. Fourth, as discussed in the previous section, there was evidence that Bulwer was not given the same remediation opportunities as his peers and that the weekly meetings with his supervisor that were part of his remediation plan did not occur. We are unpersuaded by the hospital’s argument that, even if the jury were to accept that the hospital breached its obligations, those breaches were immaterial as a matter of law. The ad hoc committee’s decision rested in large part on information considered and aired during the two meetings from which Bulwer was excluded, and the decision to terminate him appears to have stemmed from a process that did not afford any of the procedural *335 protections of the hospital’s policies or the ACGME guidelines.
c. Defamation. Bulwer’s defamation claim is based on the two mass e-mails sent to hospital personnel after his termination. He contends that the false implication of the e-mails was that his incompetence as a physician was such that he should not be engaged in a medical career. Even were we to accept this as a reasonable reading of the e-mails, and that the statements were false (neither view we hereby endorse), summary judgment properly entered on the claim.
An employer has the conditional privilege to “disclose defamatory information concerning an employee when the publication is reasonably necessary to serve the employer’s legitimate interest in the fitness of an employee to perform his or her job.” White v. Blue Cross & Blue Shield of Mass., Inc., 442 Mass. 64, 69 (2004), quoting from Bratt v. International Bus. Machs. Corp., 392 Mass. 508, 509, (1984). Here, there is no suggestion in the summary judgment record that the e-mails were sent for any reason other than to notify physicians and staff at the hospital of Bulwer’s departure. The first e-mail was sent on the day of his termination and included instructions that Bulwer was not permitted to see or treat patients. The second e-mail was sent the very next day to Bulwer’s fellow residents in the residency program.
It is true that an employer may lose its privilege if it “(1) knew the information was false, (2) had no reason to believe it to be true, ... (3) recklessly published the information unnecessarily, unreasonably, or excessively,” or (4) acted out of malice. Dragonas v. School Comm, of Melrose, 64 Mass. App. Ct. 429, 438 (2005), quoting from Sklar v. Beth Israel Deaconess Med. Center, 59 Mass. App. Ct. 550, 558 (2003). However, Bulwer did not meet his burden of putting forward a record on summary judgment that would permit a rational factfinder to conclude that the hospital was not entitled to the conditional privilege with respect to the two e-mails. See Foley v. Polaroid Corp., 400 Mass. 82, 95 (1987) (employee bears burden of demonstrating that employer has lost privilege).
d. Retaliation. General Laws c. 151B, § 4(4), “makes it unlawful for ‘any person ... to discharge, expel or otherwise discriminate against any person because he has . . . filed a complaint’ ” alleging discrimination. Psy-Ed Corp. v. Klein, 459 Mass. 697, 706 (2011), quoting from G. L. c. 151B, § 4(4). A prima facie case of retaliation requires the plaintiff to show (1) his engagement in protected conduct; (2) the infliction of some adverse *336 action; and (3) a causal connection between the two. Mole v. University of Mass., 442 Mass. 582, 591-592 (2004).
Bulwer alleges that the hospital unlawfully retaliated against him by (1) terminating him because on two occasions he responded to Flint in writing about certain criticisms of his performance, and (2) not providing him with a process to appeal from the ad hoc committee’s decision after he had filed his complaint with the Massachusetts Commission Against Discrimination (MCAD) on August 25, 2006.
Both claims fail. Bulwer’s communications related solely to his disagreement with the criticisms that had been leveled against his work — they cannot be reasonably read to raise a complaint about discrimination and, accordingly, they are not protected activity within the meaning of G. L. c. 151B, § 4(4). The record shows that the hospital offered Bulwer a discretionary appeal from the ad hoc committee decision, and that Bulwer never pursued the offer of appeal. Moreover, the fact that Bulwer’s MCAD complaint was filed more than two months after the hospital offered him an appeal defeats his ability to demonstrate any causal connection between the protected activity and the supposed retaliation. See Mole v. University of Mass., 442 Mass, at 592 (inferable causal connection will arise from adverse employer action “in the immediate aftermath” of employer’s awareness of protected activity).
e. Tortious interference. To prove that Flint, Wellisch, and Balestrero intentionally interfered with his contractual relationship with the hospital, Bulwer must prove that they acted “malevolently, i.e., for a spiteful malignant purpose unrelated to the legitimate corporate interest.” Ayash v. Dana Farber Cancer Inst., 443 Mass. 367, 395 (2005), quoting from Wright v. Shriners Hosp. for Crippled Children, 412 Mass. 469, 476 (1992). Although, as set out above, we conclude that the record is sufficient to put the claim of discrimination to a jury, that record does not suffice to raise a genuine issue of fact regarding malevolence on the part of the three individual defendants.
3. Conclusion. For the reasons stated above, we reverse that portion of the judgment dismissing the claims of discrimination in violation of G. L. c. 15IB and for breach of contract. The judgment is otherwise affirmed.

So ordered.

Bulwer also asserted claims for breach of health insurance obligation, and intentional and negligent emotional distress. However, he raises no issue on appeal with respect to the adverse summary judgment ruling on those claims.

The ACGME also required that “ACGME-accredited programs must not discriminate with regard to sex, race, age, religion, color, national origin, disability, or veteran status.” This requirement does not appear to add anything of substance to G. L. c. 151B.

Two others rated him “average,” also noting Bulwer’s positive work habits.

Bulwer contends that these meetings did not occur because of Balestrero’s schedule, while she contends the opposite. On summary judgment, this dispute must be resolved in favor of Bulwer.

Song also reported that another physician in the MICU also had reported that she never had had any problems with Bulwer’s performance, that he did a very good job, and that he “tucked his patients in tightly” (a phrase apparently meaning that he left no loose ends).

The hospital notified Bulwer of his right to appeal the decision of the ad hoc committee, which he did, although it appears he did not follow the prescribed procedure.

Bulwer’s appellate brief devotes only one and one-half pages to the argument that the hospital did not meet its burden on the second stage.

The dissent incorrectly argues that the burden is on “Bulwer to prove that [the defendant’s] reason for termination constituted a pretext concealing a discriminatory purpose.” Post at 347. This is Bulwer’s burden at trial, not on summary judgment. The dissent’s error is caused by its reliance on a quotation from Lewis v. Area II Homecare for Senior Citizens, Inc., 397 Mass. 761, 765 (1986), which is an appeal from a trial, not summary judgment.

It was for a jury to decide what Wellisch meant when he said Bulwer “is not supposed to be smart, he’s supposed to gather information. This is why all of this is happening.”

The hospital’s claim it was not responsible for this physician’s departure is open to dispute. Although that physician left the program after the Board of Registration in Medicine failed to renew his license, the hospital’s negative feedback about his poor performance led to the board’s action.

This is not statistical evidence as presented in the summary judgment record because the figures are not placed within a larger numeric context for comparison. It is nonetheless evidence of the racial composition of the residents who have historically been terminated from the hospital’s residency program. On summary judgment, we are not entitled to disregard it. If the case proceeds to trial —■ as it should — the hospital will have an opportunity to rebut the inference that can be drawn from this evidence by introducing additional information concerning the composition of the program and those who have been terminated from it. The hospital (as it is entitled to), however, has chosen not to do so at this stage.

These various explanations can perhaps be reconciled. However, it is for the jury — not us — to resolve the conflict.

The hospital’s general promise of conformance with ACGME standards would incorporate by reference the ACGME requirements into the residency contract. See Chicopee Concrete Serv., Inc. v. Hart Engr. Co., 398 Mass. 476, 478 (1986) (“incorporation by a clearly stated general reference will suffice”).

Bulwer’s claim in this regard requires that we disregard the undisputed facts concerning the multiple communications to Bulwer concerning his right to appeal the ad hoc committee’s decision.