# DECISIONS

## OF THE

## APPEALS COURT

## OF

## MASSACHUSETTS

EDGAR W. DORMAN *vs.* NORTON COMPANY & others.[1]

No. 04-P-167.

Worcester. November 16, 2004. - July 15, 2005.

Present: GREENBERG, COWIN, & DOERFER, JJ.

*Employment,* Discrimination, Termination. *Anti-Discrimination Law,* Employment, Age, Termination of employment. *Unlawful Interference. Contract,* Interference with contractual relations. *Public Policy.*

In a civil action alleging age discrimination in employment, in violation of G. L. c. 151B, § 4(1B), the judge properly granted summary judgment in favor of the defendant employer, where the plaintiff employee failed to offer admissible evidence either that at least one reason given by the employer for the plaintiff's discharge was false, or that other facts demonstrated the existence of a discriminatory motive in the making of the discharge decision [6-10]; likewise, the absence of evidence of a discriminatory purpose on the part of individual defendants defeated the plaintiff's claim for intentional interference with contract [10], and there was no evidence that the plaintiff's discharge violated public policy [10-11].

[1]Robert Clark and Alan Gustafson.

CIVIL ACTION commenced in the Superior Court Department on September 7, 2000.

The case was heard by *Kenneth J. Fishman*, J., on a motion for summary judgment.

*James R. Tewhey* for the plaintiff.

*Renee E. Hackett* for the defendants.

COWIN, J. The plaintiff, Edgar W. Dorman, appeals from a judgment of dismissal of his complaint of age discrimination in employment, see G. L. c. 151B, § 4(1B), intentional interference with contractual relations, and employment termination in violation of public policy following the entry of summary judgment in favor of the defendants on each count.[2] In a comprehensive opinion, a judge of the Superior Court applied the three-stage order of proof established in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792 (1973), and adopted by the Supreme Judicial Court with respect to proceedings under G. L. c. 151B, see *Wheelock College* v. *Massachusetts Commn. Against Discrimination*, 371 Mass. 130, 134-136 (1976). Pursuant thereto, the judge assumed that the plaintiff had satisfied the first-stage obligation to present evidence sufficient to make out a prima facie case of discrimination; determined that the defendant employer, Norton Company (Norton or employer), had satisfied its second-stage burden of production by articulating and supporting a legitimate, nondiscriminatory reason for terminating the plaintiff's employment; and ultimately ruled, with respect to the third stage, that the plaintiff had not offered admissible evidence sufficient to warrant a finding that at least one of the employer's proffered reasons was untrue or that, on other grounds, the termination was motivated by a discriminatory intent. See *Blare* v. *Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 446 (1995); *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. 107, 118 (2000); *Lipchitz* v. *Raytheon Co.*, 434 Mass. 493, 501 (2001).

The defendants prevailed on their motion for summary judgment with respect to the remaining counts as well. With regard to the plaintiff's claim against the individual defendants for

---

[2]An additional count alleging defamation was withdrawn by agreement.

intentional interference with contractual relations,[3] the judge determined that the plaintiff's failure to demonstrate a discriminatory motive on the part of the employer or its agents precluded the possibility that the plaintiff could show the element of "improper motive or means" required to prevail in an intentional interference case. See *Weber* v. *Community Teamwork, Inc.*, 434 Mass. 761, 781 (2001). Likewise, the judge ruled that the plaintiff's contention that termination of his employment was motivated by his earlier report of employee theft of copper scrap, even if correct, did not rise to the level of a public policy concern that would limit the employer's rights with respect to what was otherwise at-will employment. See *Mello* v. *Stop & Shop Cos.*, 402 Mass. 555, 560-561 (1988).

On appeal, the plaintiff argues in essence that he presented, in the summary judgment record, admissible evidence sufficient to support a finding that at least one of the employer's proffered reasons was false, thereby making permissible (though not obligatory) an inference by the fact finder that the employer's real motivation for the termination was discriminatory. See *Lipchitz* v. *Raytheon Co., supra*. It follows, the argument continues, that a fact finder would be warranted in finding that the employer's agents (defendants Clark and Gustafson) acted with improper motive or by improper means when they brought about termination of the plaintiff's employment. See *Weber* v. *Community Teamwork, Inc., supra*. Finally, the plaintiff contends, with respect to his violation of public policy claim, that his discharge violated a protectable social interest in the reporting of criminal activity. We conclude that the judge's legal and factual analysis of each claim was sound, and we accordingly affirm.

*The underlying facts.* The facts that appear from the summary judgment record to be genuinely undisputed are as follows. At the recommendation of the defendant Robert Clark, Norton's chief engineer at its Worcester plant, the plaintiff was hired by Norton as a watch engineer in 1993. At that time, the plaintiff

---

[3]The plaintiff earlier withdrew his intentional interference claim against the employer, recognizing that Norton could not interfere with a contract (i.e., the employment contract) to which it was itself a party. See *Riseman* v. *Orion Research, Inc.*, 394 Mass. 311, 314 (1985).

was fifty-two years old and Clark was forty-nine. As watch engineer, the plaintiff supervised a shift of employees and monitored the operation of plant equipment, including a turbine. The first event of any significance to the case took place in March, 1995, when the plaintiff and three other watch engineers wrote to Norton to complain that the watch engineers were not receiving a competitive salary. The letter generated a decision on the part of management to conduct a wage study, as a result of which the watch engineers' hourly wages were increased.

The plaintiff's annual evaluations in June, 1996, and June, 1997, were largely positive. In 1996, he received eighty-seven points out of a possible 100, and Clark wrote that the plaintiff "had considerable experience" and was "a pleasure to work with." In 1997, the plaintiff received eighty-nine points out of a possible 100, and Clark, acknowledging the plaintiff's "varied experience and very good job skills," stated that he "works well with others."

In mid-1997, the copper scrap incident took place. Prior thereto, Norton had permitted its employees to collect and sell scrap copper which accumulated at the company's site.[4] The practice generated complaints, and Clark informed the employees that the sales could not continue. Notwithstanding this directive, certain employees carried on the sales, and the plaintiff reported the matter to Clark. Clark investigated, learning that three employees (including his cousin) had continued the practice. He orally reprimanded the employees, and directed that the amount improperly collected (about $4,000) be donated to charity. No other action against them was taken as a result of the violation.

In October, 1997, the plaintiff had an encounter with William Black, an employee assigned to the shift that the plaintiff supervised in his capacity as a watch engineer. Black apparently had concluded that the plaintiff was in some way responsible for vandalism to Black's vehicle; Black threatened the plaintiff; and the plaintiff responded with profanity. After an investigation, it was determined that Black would receive a written warning for the threat, while the plaintiff would be given an oral

[4]The amounts collected from the sales were then used to purchase gift certificates for all employees.

warning for his profanity directed at a fellow employee. Although at the time of the incident there was consideration of a shift swap that would separate Black and the plaintiff, no swap was arranged and the relationship between the two men continued to deteriorate. Feeling threatened by Black, the plaintiff, in November, 1997, installed a motion detector outside of his office to warn him of anyone approaching. Clark caused the motion detector to be removed and, after consultation with Norton's human resources manager and the defendant, Alan Gustafson, Norton's director of facilities services, Clark issued a written warning to the plaintiff stating, "Unsatisfactory job performance by failing to maintain an effective work team and work environment. Disruption of the work environment and violations of safety rules. Unauthorized installation of motion detector." The written warning also advised the plaintiff that any further disciplinary action would be cause for discharge.

Later in November, 1997, a security officer reported that the plaintiff had been sleeping at his desk. While Clark told the plaintiff that such behavior would not be tolerated, no warning was issued and the incident was not referred to in the plaintiff's next evaluation (June, 1998). However, the plaintiff's rating in that evaluation slipped considerably from what it had been in the preceding two years.[5] In the section for "specific improvement needs," Clark wrote, "Needs to improve his communication and cooperation with coworkers and supervision. Needs to continue to develop and [sic] effective work team and work environment."

On June 23, 1998, Thomas Donahue, a Norton engineer, reported both to Clark and to Norton's safety office that the plaintiff appeared to be sleeping in his office while a turbine alarm was sounding.[6] While the plaintiff denied that he was sleeping at the time, he admitted at his deposition that he heard the alarm sound and intentionally let it ring for an additional five or ten minutes (apparently to demonstrate to management

[5]Norton's change between 1997 and 1998 in its scoring system prevents a specific point comparison among the evaluations in question.

[6]The alarm was installed to indicate that steam pressure activity had become either unacceptably high or unacceptably low. Such conditions could result in damage to the system or to Norton's product.

the validity of his and others' continuing insistence that the alarm was too loud). On the basis of the more recent sleeping incident, the prior written warning, the performance review of June, 1998, and a "failure to perform his duties," Clark ordered the plaintiff's employment terminated effective June 29, 1998. At that time, both of the individual defendants and all of the on-site employees, with a single exception, were within the protected class, i.e., over forty years of age. See G. L. c. 151B, § 1(8); *Knight* v. *Avon Prods., Inc.*, 438 Mass. 413, 420-421 (2003).

*Discussion.* As indicated above, the judge assumed that the plaintiff had satisfied his burden on summary judgment to present evidence that would, if believed, establish a prima facie case. The defendants challenge this, asserting that the plaintiff did not demonstrate that he was performing his job in an acceptable manner. See *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. at 116.[7] Because the defendants prevail on other grounds, we need not decide the issue. We note, however, that "the plaintiff's initial burden of establishing a prima facie case is not intended to be onerous." *Sullivan* v. *Liberty Mut. Ins. Co.*, 444 Mass. 34, 45 (2005), citing *Texas Dept. of Community Affairs* v. *Burdine*, 450 U.S. 248, 253 (1981). Whether the plaintiff performed at a satisfactory level was disputed, and the plaintiff offered at least some evidence that his performance was adequate. The judge's assumption regarding the plaintiff's satisfaction of his burden in the first stage was not unreasonable.

That the defendants met their burden of producing and supporting nondiscriminatory reasons for discharging the plaintiff, see *Sullivan* v. *Liberty Mut. Ins. Co.*, *supra* at 50, is not disputed. The outcome of the case turns, therefore, on the answer to the question whether the plaintiff has offered admissible evidence sufficient to avoid summary judgment that shows either that at least one reason given by the employer for the discharge was false, see *Lipchitz* v. *Raytheon Co.*, 434 Mass. at 501, or that other facts demonstrate the existence of a discriminatory motive

---

[7]The defendants concede that the plaintiff made an adequate showing with respect to the remaining elements of the prima facie case.

in the making of the discharge decision, see *Blare* v. *Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. at 446.

The plaintiff did not attempt to develop so-called direct evidence of discrimination, such as suspect statements by management on the subject of age or statistical studies showing that protected class members were often treated differently from younger employees. Indeed, such demonstrations were unlikely given that virtually all of the employees at the operation of which the plaintiff was a part were over forty years of age, and that the plaintiff was first hired, then discharged, by a supervisor (Clark) who was himself the plaintiff's junior by a mere three years.

Thus, the plaintiff instead attempted to make his third-stage case by offering evidence of alleged different treatment between himself and other employees who were younger. This, he argues, would support a finding that one or more reasons for the plaintiff's discharge were a pretext, therefore permitting a fact finder to draw the inference that the employer's true purpose was discriminatory. See *Lipchitz* v. *Raytheon Co., supra*. The principle, i.e., that evidence that similarly situated employees were treated differently can establish that a proffered reason for an adverse job action was a pretext, is sound. See *Matthews* v. *Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 129 (1997). The problem for the plaintiff is that the evidence does not demonstrate that the defendants treated similarly situated employees differently, or otherwise singled out the plaintiff (or a class of which he was a member) for special, negative treatment. This being the case, the inference on which the plaintiff depends cannot reasonably be drawn.

Examining the plaintiff's factual assertions in chronological order, there is no evidence of a connection between the plaintiff's participation in March, 1995, in the watch engineers' effort to obtain a wage increase and his employment termination in June, 1998. The effort was ultimately successful; the plaintiff's role generated no negative oral or written responses; there was no evidence that adverse action was taken against any of the other watch engineers; the plaintiff's evaluations in 1996 and 1997 were favorable; and the passage of time between the wage request and the discharge (more than three years) strongly suggests that the events were unrelated.

With respect to the plaintiff's report in mid-1997 regarding the continued sale of copper scrap, in violation of Norton's new policy, the defendants were entitled to evaluate the significance of the violation and to select a response they considered appropriate in the circumstances. See *Smith College* v. *Massachusetts Commn. Against Discrimination*, 376 Mass. 221, 229 (1978). Here, management concluded that an oral reprimand and contribution of the sale proceeds to charity were sufficient. There is no basis for assuming that these employees were treated any differently with respect to the level of discipline imposed than any other employees in the same situation would have been treated. Clearly there was no different treatment with respect to the plaintiff, given that he was not a violator and was not disciplined.

Turning to the plaintiff's episode with his subordinate, William Black, and its aftermath, the plaintiff again complains of a difference in treatment. We are unable to identify an inequitable difference. Management disciplined Black more severely for the threat (a written warning) than it disciplined the plaintiff for the use of profanity to a subordinate (an oral warning). That management did not accommodate the plaintiff's request for a shift change, arguably difficult given that the plaintiff had supervisory functions, was not shown to be a product of anything other than an exercise of management's right to deploy personnel in a manner it deems best for its own business purposes. Likewise, management's response to the plaintiff's unauthorized installation of the motion detector, including the written warning advising that further disciplinary action would be cause for discharge, has not been shown to be unreasonable per se or otherwise inconsistent with Norton's disciplinary practices.

The slippage in the plaintiff's performance evaluation in June, 1998, and the emphasis on his need to improve his teamwork and supervisory skills were not arbitrary in light of the incident with Black and the motion detector installation. Given the events of the preceding eight months, particularly the written warning that further discipline could lead to discharge, the defendants' termination of the plaintiff's employment following the second report that he had been observed sleeping on

the job was, at least facially, well within the scope of permissible action by an at-will employer, and the plaintiff has offered no evidence that would suggest that the treatment was either inequitable or unduly harsh in light of the employer's normal practices.

The plaintiff contests the truth of the engineer Donahue's report of the plaintiff sleeping on the job that constituted the last link in a chain of events leading to his termination. He denies that he was sleeping (either then or on a prior occasion when a similar report was made) and argues with the accuracy of Clark's effort to verify the report of a reading of the pressure gauge. It is unnecessary to resolve these questions. The plaintiff admitted that he intentionally delayed silencing the turbine alarm, an act of questionable judgment from an operational viewpoint that would by itself have been of legitimate concern to management. Furthermore, the plaintiff confuses the alleged falsity of Donahue's accusation that he had been sleeping with the falsity, the plaintiff claims, of the reasons given by the employer for his discharge. It is the latter that is significant under *Abramian* v. *President & Fellow of Harvard College*, 432 Mass. at 117, and *Lipchitz* v. *Raytheon Co.* 434 Mass. at 501, and there is no evidence here that the defendants discharged the plaintiff on the basis of a report that they knew to be false.[8]

To the extent that the plaintiff argues that the above incidents, taken as a whole rather than viewed in isolation, demonstrate a disparity between the leniency with which other employees were treated and the harshness meted out to the plaintiff, the short answer is that the offenses were dissimilar, particularly when examined in the light of the plaintiff's work history immediately preceding his discharge. In the absence of any evidence of different treatment of the plaintiff by the defendants,

---

[8]We do not rely, in this regard, on the plaintiff's admission in his response to the defendants' statement of undisputed facts, see Superior Court Rule 9A(b)(5), that "Mr. Clark, Ms. Fitzgerald and Mr. Gustafson decided that Plaintiff's sleeping on the job and failure to respond to a critical steam pressure alarm, while on a final written warning, warranted termination of his employment." Read in isolation, the admission suggests a concession that the defendants acted in good faith. Looking at the responses in their entirety, however, we believe that the plaintiff has made it clear that he deems the reasons given to be a pretext.

the plaintiff's case that there was pretext, and therefore discriminatory motive, on the defendants' part collapses completely. There is no direct evidence of discrimination. The only indirect evidence, i.e., that the employer's proffered reasons for discharge were false in at least one respect, fails because the record contains nothing to support a finding that those reasons were in fact false. The plaintiff cannot avoid summary judgment merely by speculating that his treatment by the employer came about not because of the merits of his performance as the employer observed it, but rather because of impermissible consideration of his age. The third-stage burden of proof requires more than that. Accordingly, there being a failure of proof that age was in any way a motivating factor, summary judgment for the defendants on this count was correctly entered.

We briefly address the plaintiff's remaining claims. An action for intentional interference with contract requires that the plaintiff prove the existence of a contract; the intentional interference with the contract by one or more third parties; that such interference was improper in motive or means; and resulting harm to the plaintiff. See *Weber* v. *Community Teamwork, Inc.*, 434 Mass. at 781. His case on the third element (improper motive or means) is dependent on his allegation of age discrimination. That allegation, if proved, could satisfy the requirement that the interference be motivated by "a spiteful, malignant purpose, unrelated to the legitimate corporate interest." *Id.* at 782, quoting from *Boothby* v. *Texon, Inc.*, 414 Mass. 468, 487 (1993). Here, the absence of evidence of discriminatory purpose on the part of the individual defendants defeats the claim of intentional interference.

Finally, there was no evidence that the plaintiff's discharge violated public policy. Passing the defendants' contention that the plaintiff has waived his claim that he was fired because he was part of a group that had successfully sought improved wages three years earlier (by virtue of not arguing the issue before the Superior Court), we see no basis for concluding that there were actionable public policy implications either for that reason or because the plaintiff complained to management about the unauthorized collection and sale of copper scrap. The public policy exception to the rights of the employer in an at-will

employment relationship is narrowly construed. See *Wright* v. *Shriners Hosp. for Crippled Children*, 412 Mass. 469, 472 (1992). Both the wage increase request and the report of sales of copper scrap fell within the well-recognized principle that internal corporate matters do not provide a basis for the public policy exception. See *Mello* v. *Stop & Shop Cos.*, 402 Mass. at 560-561. The exception for reports of criminal activity, see *Shea* v. *Emmanuel College*, 425 Mass. 761, 762-763 (1997), is inapplicable; there is no basis for characterizing the sale of the copper scrap as anything other than a violation of a new company rule. Furthermore, the record is devoid of any indication that either the wage increase request or the copper scrap sale complaint brought about the plaintiff's discharge.

*Judgment affirmed.*