NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11875

BERNARD E. BULWER vs. MOUNT AUBURN HOSPITAL & others.[1]

Middlesex.    November 3, 2015. - February 29, 2016.

Present: Gants, C.J., Spina, Cordy, Botsford, Duffly, & Lenk, JJ.

Hospital, Appointment to staff. Anti-Discrimination Law, Race, Employment. Employment, Discrimination. Contract, Employment, With hospital, Performance and breach. Practice, Civil, Summary judgment.

Civil action commenced in the Superior Court Department on February 22, 2008.

The case was heard by S. Jane Haggerty, J., on a motion for summary judgment.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

Robert R. Hamel, Jr. (Megan E. Kures with him) for the defendants.
Denzil D. McKenzie (James E. Clancy, IV, with him) for the plaintiff.
James A.W. Shaw, for Massachusetts Employment Lawyers Association, amicus curiae, submitted a brief.

_____

[1] Eric Flint, Ricardo Wellisch, and Lori Balestrero.

LENK, J.  Massachusetts law prohibits employers from discriminating against their employees on the basis of, among other things, race or national origin.  See G. L. c. 151B, § 4.  Because direct proof of such discrimination is rarely available, employees filing claims under G. L. c. 151B, § 4, are permitted to prove discrimination without direct evidence of discriminatory intent, by relying on evidence that their employers gave a "false reason,"[2] or pretext, for terminating their employment.  In this case, we address whether the plaintiff has produced sufficient evidence of pretext to survive his former employer's motion for summary judgment.  In doing so, we clarify the evidentiary burdens each party faces after one party has moved for summary judgment.  We address, in particular, three concerns:  whether the evidence on which an employee relies to survive a defendant's motion for summary judgment need show not only that the defendant's stated reason was false, but also that it concealed a discriminatory purpose; whether it is the plaintiff's burden to persuade the motion judge based on that evidence that there is an issue of material fact appropriate for trial; and, finally, whether, in discerning

---

[2] A "false reason" is one that is not the real reason for terminating an individual's employment, regardless whether the false reason is factually accurate.  See Lipchitz v. Raytheon Co., 434 Mass. 493, 502 (2001) (Lipchitz); Wheelock College v. Massachusetts Comm'n Against Discrimination, 371 Mass. 130, 139 (1976).

the existence of an issue of material fact, the motion judge may weigh or otherwise evaluate the evidence.

The plaintiff, Bernard E. Bulwer, is a black male of African descent who is originally from the Central American country of Belize.  The plaintiff has a medical degree from the University of the West Indies, and practiced medicine outside the United States until 2002, when he came to this country.  In order to become certified to practice medicine in the United States, he was required to complete a residency program here.  During the first year of his residency at the defendant Mount Auburn Hospital (hospital), the plaintiff received diametrically opposing reviews from supervising physicians, some laudatory and others deeply critical, after which the hospital terminated his employment.  The plaintiff filed a ten-count complaint in the Superior Court against the hospital and three physicians who supervised his work, asserting, among other things, employment discrimination under G. L. c. 151B, § 4, and breach of contract.[3] Concluding that the plaintiff had not produced sufficient evidence of the defendants' discriminatory intent, a Superior Court judge allowed the defendants' motion for summary judgment

---

[3] The plaintiff also alleged retaliation in violation of G. L. c. 151B, § 4; breach of a health insurance obligation in violation of G. L. c. 175, § 110D; defamation; intentional infliction of emotional distress; negligent infliction of emotional distress; and three counts of tortious interference with a contractual relationship.

on all claims.  The plaintiff appealed, and a divided Appeals Court reversed the judgment as to the discrimination and breach of contract claims, while affirming the decision on all of the other claims.  We allowed the defendants' application for further appellate review, limited to the claims for discrimination under G. L. c. 151B, § 4, and breach of contract. We conclude that the defendants were not entitled to summary judgment and that the plaintiff has presented evidence sufficient to allow a jury to hear his claims.

1.  Background.  We summarize facts drawn from the summary judgment record, reserving certain details for later discussion. See LeBlanc v. Logan Hilton Joint Venture, 463 Mass. 316, 318 (2012) (LeBlanc).  The plaintiff, in addition to his medical degree, has postgraduate training in a number of fields, including cardiovascular disease.  He practiced medicine in Trinidad, Belize, and the United Kingdom from 1989 through 2002. In 2002, the plaintiff came to the United States as a research associate and fellow in a subresidency cardiology program at another hospital in Boston, where he worked until 2005.

In the spring of 2005, hoping to obtain a medical license to practice in the United States, the plaintiff contacted the defendant Dr. Eric Flint, director of the internal medicine residency program at the hospital.  In June, 2005, after an interview with Flint, the plaintiff was offered a residency at

the hospital.  Because of delays in the processing of his visa, he began his residency in September, 2005, two months later than the other residents in his cohort.

In August, 2005, the plaintiff signed the hospital's standard medical resident agreement (agreement), setting forth the terms and conditions of his employment.  The agreement was for a one-year term, renewable for an additional two years upon satisfactory completion of the first-year program.

The agreement stated that the hospital and its residency program would comply with the requirements promulgated by the national Accreditation Council for Graduate Medical Education (ACGME).  ACGME requires, among other things, that member programs not discriminate against residents on grounds including race and national origin.  It also requires that programs provide residents with written procedures that must be followed in the event a program seeks "academic or other disciplinary action" against a resident.

The hospital's written procedures state that, should a resident's supervisors decide to terminate a resident's employment, a resident has the right to convene an ad hoc committee[4] consisting of the heads of various departments, the resident at issue, and another resident to be chosen by mutual

---

[4] The hospital's rules refer to this committee variously as the "ad hoc committee," the "due process committee," and the "ad hoc due process committee."

agreement. Such a committee would then be empowered to conduct an independent review of the employment decisions made by the resident's supervisors. The procedures provide further that

> "[t]he resident is assured of the fundamental aspects of a fair hearing including written statement of the specific issues from the Department Chair, at least [five] days notice of the Due Process Committee meeting, the opportunity to be present and to rebut the evidence, and the opportunity to present any other information.

> ". . .

> "All matters upon which any decision is based must be introduced into evidence at the proceeding before the Ad Hoc Due Process Committee in the presence of the resident."

Residents may then appeal the committee's decision to the "President of the Medical Staff."

After signing the agreement, the plaintiff began his residency in September, 2005. The first-year program consisted of twelve one-month rotations in a number of different "services" throughout the hospital. The plaintiff's performance was to be evaluated by attending physicians and resident supervisors in each of the services where he worked. The evaluating physicians were to fill out evaluation forms, which called for numerical ratings of various aspects of the plaintiff's performance, as well as for written comments. These evaluations in turn would be given to the clinical competence committee (CCC), a panel of thirteen physicians who met regularly to discuss the progress of all of the residents. The

plaintiff was also assigned a mentor, the defendant Dr. Lori Balestrero.

The plaintiff's first rotation in September was in the hospital's emergency department. The plaintiff received strongly positive evaluations in that department. Two physicians rated him as "outstanding," and five others rated him "above average." They described him as knowledgeable, mature, and pleasant to work with. Dr. Gary Setnik, head of the emergency department, provided a more lengthy written evaluation:

"Dr. Bulwer is universally held in high regard by the staff I polled and by myself. He has been totally reliable, coming in early, and staying late on most shifts. He aggressively works to see as many patients as possible. His presentations are complete, his management plans appropriate, and his procedural skills very good."

The next month, the plaintiff rotated into the medical intensive care unit (MICU). There, he received mixed evaluations. In an October, 2005, electronic mail message to a colleague, Dr. Soon-Il Song wrote positively that

> "[the plaintiff] had procedural skills and knowledge base
> well above someone at an intern level. He also was
> pleasant to work with. He had a good sense of his own
> limitations, and asked questions often in order to clarify
> issues. I think his ability to gather information in
> history taking was quite good and thorough. Above all, he
> maintained composure and a good attitude, despite the fact

that we had an especially difficult night of no sleep and challenging patients requiring multiple attending input in the middle of the night."

Other physicians, however, viewed the plaintiff's performance negatively. One wrote that the plaintiff "[m]ade drastic and potentially dangerous/life threatening decisions about [patient] care [without] consulting [the] attending [physician]. . . . [He is] [t]oo confident for his own good and [the patient's] own good without showing any proof of capability to perform at the level of an intern or resident yet." Another commented that the plaintiff was "eager to learn" but that "[h]e does not seem to be aware of his responsibilities as an intern despite being told them repeatedly." In response, the plaintiff sent an electronic mail message to Flint stating that he did not believe these negative reviews were objective, and asking Flint to obtain evaluations from four named physicians with whom the plaintiff had seen patients. Flint did not do so.

Setnik reported that both he and other members of his department received harsh comments from members of the MICU staff for his positive evaluations of the plaintiff. He described this as "[a]n experience that I hadn't previously had at Mount Auburn."

In November, 2005, Balestrero, the plaintiff's mentor, met with the plaintiff to discuss the negative feedback. The plaintiff told her that he thought the negative impressions were

inaccurate.  Balestrero then met with the CCC to discuss ways in which the plaintiff could improve.  Following this meeting, Balestrero presented the plaintiff with a plan for improvement that she had developed together with the CCC.  The plan included a provision for weekly meetings with Balestrero and a follow-up meeting, to be held after evaluations from the December rotation were received, with the plaintiff, Balestrero, and a CCC representative.  Neither the weekly meetings nor the follow-up meeting took place.[5]

During November and December of 2005, the plaintiff was assigned a "wards" rotation in which he provided general internal medicine care for patients who had been admitted to the hospital.  The three evaluations from that rotation that appear in the record were positive, with one evaluator noting "much improvement," and another stating that the plaintiff was "[o]verall . . . pretty good."  The third evaluator assigned a passing grade, but stated that the plaintiff needed improvement in "practice-based learning," professionalism, and organization of notes charting patients' progress.

In January, 2006, the plaintiff rotated into the cardiology department.  He received three evaluations of his work on that

---

[5] The plaintiff states that these meetings did not occur because of Balestrero's schedule, while the defendants contend that it was the plaintiff's schedule that prevented the meetings from taking place.

service.  One rated him as failing in five of six competencies, but another gave him high marks in all competencies, and the third described his presentations as "very commendable" and his knowledge as "excellent."  In mid-January, 2006, the plaintiff met with Balestrero, who told him that he had received positive evaluations and that "the past [was] behind [him]."

In February, 2006, the plaintiff rotated again into the wards service.  One evaluator there rated him positively, while the other, Dr. Erica Bial, wrote a lengthy and negative evaluation in which she described her experience with the plaintiff as "horrendous."  She stated that "[t]here is no aspect of the central competencies in which [the plaintiff] is even modestly competent."  She described him as "less-than-fully-honest" and as having "a difficult time being appropriate with . . . women in the professional environment," and recommended that the plaintiff be expelled from the residency program.  During this period, Bial "berated" the plaintiff publicly in a manner that a witness, Song, described as not "appropriate," and as unprecedented in his experience with Bial. Song also reported that Bial spoke negatively to other residents about the plaintiff, outside of the plaintiff's presence.

In March, 2006, the CCC discussed the plaintiff's mixed evaluations.  On April 5, 2006, the CCC sent the plaintiff a letter stating that it would not renew his contract because of

concerns about his ability to analyze complex information, his inability to "build effective therapeutic relationships," and his difficulty presenting information to other members of his teams.  The letter stated also that the plaintiff could finish his first year of residency, working until the end of his contract term in August, 2006.  The letter was signed by Flint and by the defendant Dr. Ricardo Wellisch, chair of the CCC.

The plaintiff invoked his right to convene an ad hoc committee pursuant to the hospital's "due process" policy.  Although the committee consisted of most of the individuals specified in that written policy, no resident was seated on it, as required by the policy.  Further, of the committee's three meetings, the plaintiff was invited to attend only the first one, which took place on April 24, 2006.  At that first meeting, as well as at the second, on May 2, 2006, the committee heard testimony from physicians who had previously evaluated the plaintiff during his rotations.  The transcripts of these meetings do not reflect discussion of the possibility that the plaintiff's contract would be terminated immediately, and the plaintiff did not receive any notice to that effect.[6]  He requested that the committee forward to him any materials

---

[6] The record does not contain a transcript of the third meeting on May 9, 2006, at which the committee apparently deliberated and reached a decision.

considered during the meetings he did not attend; those requests were not answered.

On May 9, 2006, the committee sent a letter to Dr. Stephen Zinner, chair of the department of medicine, stating that it would affirm the decision of the CCC not to renew the plaintiff's contract. On May 17, 2006, Zinner informed the plaintiff verbally that, because of "serious additional concerns" for "patient safety" that had arisen "in the past [three] weeks," the plaintiff would "be immediately relieved of his responsibilities."

The plaintiff sent a letter dated May 18, 2006, to the president and chief executive officer of the hospital stating his desire to appeal, as provided in the due process policy, from the committee's decision not to renew his contract and to terminate his employment immediately. The president responded with a certified letter, return receipt requested, saying that she would convene such a committee. The plaintiff did not retrieve the letter from the postal service, which attempted delivery three times, and did not pursue the appeal.

In August, 2006, the plaintiff filed a charge of discrimination against the hospital with the Massachusetts Commission Against Discrimination. In February, 2008, the plaintiff filed his complaint in the Superior Court, naming the hospital, Balestrero, Flint, and Wellisch as defendants. During

discovery, depositions were taken of various doctors who had worked with the plaintiff, including Dr. Ramona Dvorak, an African-American internist and psychiatrist formerly employed at the hospital, who described what she believed to have been incidents of racism she experienced during her employment. Following discovery, in December, 2010, the defendants sought summary judgment on all counts; in June, 2011, their motion was allowed.

2. Discussion. The plaintiff contends that the motion judge erred in allowing the defendants' motion for summary judgment on his claim for employment discrimination on the basis of his race and national origin, in violation of G. L. c. 151B, § 4, and on his breach of contract claim based on his termination in violation of the procedures set forth in the medical resident agreement. The plaintiff maintains that there were disputed issues of material fact as to both claims, and the matter should proceed to trial.

a. Standard of review. A motion for summary judgment under Mass. R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002), is appropriate where "the moving party . . . 'show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law' based on the undisputed facts." Premier Capital, LLC v. KMZ, Inc., 464 Mass. 467, 474 (2013), quoting Mass. R. Civ.

P. 56 (c). "In reviewing the . . . grant of a motion for summary judgment, we conduct a de novo examination of the evidence in the summary judgment record . . . and view the evidence in the light most favorable to the part[y] opposing summary judgment" (citation omitted)," LeBlanc, supra at 318, "drawing all reasonable inferences in [the nonmoving party's] favor." Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 38 (2005) (Sullivan).

   b.  Discrimination claim.  i.  Evidentiary burdens. General Laws c. 151B, § 4, provides that "[i]t shall be an unlawful practice . . . [f]or an employer . . . because of the race, color, . . . [or] national origin . . . of any individual . . . to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."  In order to prevail at trial, an employee bringing a complaint under G. L. c. 151B, § 4, must demonstrate four things:  that he or she is a member of a protected class; that he or she was subject to an adverse employment action; that the employer bore "discriminatory animus" in taking that action; and that that animus was the reason for the action (causation).  See Lipchitz v. Raytheon Co., 434 Mass. 493, 502 (2001) (Lipchitz).  The question here is whether the plaintiff provided evidence from which a reasonable jury could infer the presence of the latter

two elements, i.e., that the defendants bore discriminatory animus and that the animus was the reason the defendants terminated the plaintiff's employment.

In the pretrial context, an employee asserting a discrimination claim under G. L. c. 151B, § 4, may survive a motion for summary judgment by providing "[d]irect evidence of [the] elements" of discriminatory animus and causation. Sullivan, supra at 39. Because such direct evidence "rarely exists," however, an employee plaintiff may also survive such a motion by providing "indirect or circumstantial evidence [of discriminatory animus and causation] using the familiar three-stage, burden-shifting paradigm first set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-805 (1973) (McDonnell Douglas)." Sullivan, supra at 39-40.

"In the first stage [of this paradigm], the plaintiff has the burden to show . . . a prima facie case of discrimination." Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 441 (1995) (Blare). To do so, a plaintiff must provide "evidence that: (1) he [or she] is a member of a class protected by G. L. c. 151B; (2) he [or she] performed his [or her] job at an acceptable level; [and] (3) he [or she] was terminated." Id. "In the second stage, the employer can rebut the presumption created by the prima facie case by articulating a legitimate, nondiscriminatory reason for its [employment]

decision." Id. In the third stage, the burden of production[7] shifts back to the plaintiff employee, requiring the employee to provide evidence that "the employer's articulated justification [for the termination] is not true but a pretext." Id. at 443.

The defendants contend that, at this third stage, the plaintiff must present evidence that the "[hospital]'s reason for termination constituted a pretext concealing a discriminatory purpose" (emphasis supplied). Bulwer v. Mount Auburn Hosp., 86 Mass. App. Ct. 316, 347 (2014) (Sikora, J., dissenting) (Bulwer). See id. at 355 (Sikora, J., dissenting) (taking position that claim fails because plaintiff did not show "invidious intent"). This formulation, however, overstates the plaintiff's burden at the summary judgment stage because "Massachusetts is a pretext only jurisdiction." Blare, supra at 443. See Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 114-115 (2000). As we explained in Lipchitz, supra at 500-501:

> "The phrase 'pretext for discrimination' implies that the plaintiff must prove not only that a reason given by the employer for the adverse decision was false, but that the reason was given to cover a discriminatory animus. Our

---

[7] The "burden of production" refers to "a party's obligation to come forward with evidence to support its claim." Director, Office of Workers' Compensation Programs, Dep't of Labor v. Greenwich Collieries, 512 U.S. 267, 272 (1994) (Greenwich). This is distinct from the burden of persuasion, often called the "burden of proof," which refers to "the notion that if the evidence is evenly balanced, the party that bears the burden of persuasion must lose." Id.

decisions do not require this. . . .  If the employee were able to prove by direct evidence that discriminatory animus motivated the decision, [he] would not have to rely on the indirect method of proving animus by disproving at least one of the employer's articulated, nondiscriminatory reasons" (citations omitted).

To survive a motion for summary judgment, the plaintiff need only present evidence from which a reasonable jury could infer that "the respondent's facially proper reasons given for its action against him were not the real reasons for that action."  Wheelock College v. Massachusetts Comm'n Against Discrimination, 371 Mass. 130, 139 (1976) (Wheelock College). The case can then proceed to trial, at which point, "if the fact finder is persuaded that one or more of the employer's reasons is false, it may (but need not) infer that the employer is covering up a discriminatory intent, motive or state of mind."[8] Lipchitz, supra at 501.  In other words, a fact finder at trial may infer that, "[c]ombined with establishment of a prima facie case . . . , a showing of pretext eliminates any legitimate

_____

[8] While Lipchitz, supra, involved a motion for judgment notwithstanding the verdict, see Mass. R. Civ. P. 50 (b), as amended, 428 Mass. 1402 (1998), rather than a motion for summary judgment, "[t]he standard for obtaining a judgment notwithstanding a verdict in Massachusetts is the same as the summary judgment standard."  Sarro v. Philip Morris USA Inc., 857 F. Supp. 2d 182, 189 (D. Mass. 2012).  See Cahaly v. Benistar Prop. Exch. Trust Co., 451 Mass. 343, 350 (2008), cert. denied, 555 U.S. 1047 (2008), quoting Phelan v. May Dep't Stores Co., 443 Mass. 52, 55 (2004) ("We ask whether, construing the evidence most favorably to the plaintiff, and 'without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, the jury reasonably could have returned a verdict for the plaintiff'").

explanation for the adverse hiring decision and warrants a determination that the plaintiff was the victim of unlawful discrimination."[9]  Blare, supra at 446.

The defendants also argue that, at this third stage, the burden of persuasion is on the "the plaintiff . . . to demonstrate that there is a genuine issue of material fact whether the defendants' proffered reason is a pretext" (emphasis in original).[10]  Bulwer, supra at 347 (Sikora, J., dissenting). See id. at 348 (Sikora, J., dissenting) ("plaintiff must substantiate a genuine issue of" material fact).  While the plaintiff does bear "the burden of producing evidence" that the employer's reasons are pretextual, see Matthews v. Ocean Spray

_____

[9] We nonetheless reiterate that, at trial,

"[p]ermitting the fact finder to infer discriminatory animus from proof that the employer has advanced a false reason does not . . . eliminate the plaintiff's burden to prove this essential element. . . .  Stated differently, the 'indirect evidence' moniker derives from the type of evidence (pretext) that may establish one or both statutory elements (discriminatory animus and causation)" (citation omitted).

Lipchitz, supra at 502.

[10] This burden is described as requiring the plaintiff to demonstrate that the "the employer's articulated reason lack[s] reasonable support in evidence or is . . . wholly disbelievable."  Bulwer v. Mount Auburn Hosp., 86 Mass. App. Ct. 316, 347 (2014) (Bulwer) (Sikora, J., dissenting), quoting Lewis v. Area II Homecare for Senior Citizens, Inc., 397 Mass. 761, 765 (1986) (Lewis).  This language, drawn from Lewis, supra, described the plaintiff's burden at trial and not, as here, at summary judgment.  See id. at 765 ("judge found [after bench trial] . . . that the plaintiff failed to prove pretext").

Cranberries, Inc., 426 Mass. 122, 127 (1997) (Matthews), the burden of persuasion at summary judgment remains with the defendants, who, "as the moving part[ies], 'ha[ve] the burden of affirmatively demonstrating the absence of a genuine issue of material fact on every relevant issue, even if [they] would not have the burden on an issue if the case were to go to trial.'" Sullivan, supra at 39, quoting Matthews, supra.

ii. Questions of material fact. In opposing the defendants' motion for summary judgment, the plaintiff relies on indirect evidence of discrimination, which we analyze using the McDonnell Douglas three-stage paradigm. The defendants concede, with regard to the first stage, that the plaintiff has satisfied his obligation to make out a prima facie case of discrimination.[11] With regard to the second stage, the defendants assert that the plaintiff's employment was terminated based on his poor performance evaluations, included in the record, that express doubts about his abilities and raise concerns for patient safety. This satisfies the defendants' obligation to produce both "lawful . . . reasons for [their] employment decision" and "credible evidence to show that

_____

[11] The defendants' concession that the plaintiff "could establish a prima facie case" is "for summary judgment purposes only."

the . . . reasons advanced were the real reasons."[12]  See <u>Blare</u>, <u>supra</u> at 442, quoting <u>Wheelock College</u>, <u>supra</u> at 138.  We therefore move to the third stage, and consider whether the plaintiff has provided evidence sufficient to allow a reasonable jury to infer that "the employer's articulated justification is not true but a pretext."  <u>Blare</u>, <u>supra</u> at 443.

    We begin by reciting more specifically the reasons provided by the hospital for terminating the plaintiff's employment.  In April, 2006, Wellisch and Flint sent a letter to the plaintiff citing his "inability to adequately analyze clinical data in complex cases," "inability to consistently build effective therapeutic relationships," and "inability to gain insight into feedback that is offered."  In May, 2006, Zinner decided to terminate the plaintiff's employment immediately due to asserted "additional clinical errors, failures to document or comply with our clearly stated expectations about chart notes, and failures to call for appropriate help with severely ill patients."

    The record contains at least five categories of evidence from which a jury might infer that these stated reasons were not the real reasons that the plaintiff's employment was terminated. When "taken as a whole rather than viewed in isolation," such

---

    [12] As the Appeals Court noted, the plaintiff "does not seriously argue that the hospital failed to meet its non-onerous burden of articulating a legitimate reason for his termination." <u>Bulwer</u>, <u>supra</u> at 329-330.

evidence could lead a rational jury to conclude that the reasons for the plaintiff's discharge were pretextual.  See Dorman v. Norton Co., 64 Mass. App. Ct. 1, 9-10 (2005).

First, while the record plainly contains negative evaluations tending to support the aforementioned criticisms, the record also contains numerous evaluations inconsistent with these criticisms.  See Cole v. Ruidoso Mun. Schs., 43 F.3d 1373, 1380 (10th Cir. 1994) (reversing summary judgment for employer where conflicting evaluations raised fact questions about true reasons for adverse employment action).  See also Bonefont-Igaravidez v. International Shipping Corp., 659 F.3d 120, 124 (1st Cir. 2011), quoting Gómez–González v. Rural Opportunities, Inc., 626 F.3d 654, 662–663 (1st Cir. 2010) ("pretext can be established by showing . . . 'weaknesses [or] implausibilities . . . in the employer's offered reasons'"); 59 Causes of Action 2d, Cause of Action under Age Discrimination in Employment Act § 24 (2013) ("evidence of satisfactory or superior performance evaluations . . . may tend to show . . . the illegitimate nature of the defendant's articulated reason").

For example, some evaluators wrote of the plaintiff's "excellent" "ability to interpret and analyze clinical data, and formulat[e] a plan of management," even as the plaintiff was dismissed ostensibly because he could not "adequately analyze clinical data in complex cases."  Similarly, some evaluators

praised the plaintiff's "progress notes" as "very detailed and informative," "very thorough," and "generally well thought out," while others criticized him for "fail[ing] to document or comply with . . . expectations about chart notes."  Moreover, evaluations noting that "several patients have commented on [the plaintiff's] thoroughness and humanistic qualities" and that "patients' family members told [the evaluator] several times how helpful he had been during an emotionally difficult time" are in some tension with the view that the plaintiff evinced an "inability to consistently build effective therapeutic relationships."  The record also contains evaluations noting that the plaintiff "had a good sense of his own limitations" and that he took "in feedback well."[13]  These disparate evaluations prompted the chair of the ad hoc committee to note that "it is

_____

[13] Two other points along these lines are noteworthy. First, the plaintiff received contradictory advice from evaluators.  While one evaluator criticized him for making "drastic" decisions on his own, another suggested, only one month earlier, that the plaintiff "work on his independence and self-initiative, mainly in terms of seeing patients primarily on his own and getting out of a 'shadowing' mode."  Second, a letter from the hospital to the Board of Registration in Medicine, sent pursuant to G. L. c. 111, § 53B, explained that the plaintiff's employment had been terminated immediately because he "[f]ail[ed] to make appropriate progress in processing and applying evaluations and other constructive criticism and feedback to patient care responsibilities."  The plaintiff himself was told, however, that the immediate termination was not because of delays in his progress, but rather because of an immediate "risk to patient safety." Although these statements might be reconcilable, a jury could find in them inconsistency suggestive of the pretextual nature of the proffered reasons.

interesting how one set of behaviors can elicit such different perception."

There is, secondly, evidence that the plaintiff was treated differently from similarly situated interns who are not black. See Matthews, supra at 129 ("The most probative means of establishing that the plaintiff's termination was a pretext for racial discrimination is to demonstrate that similarly situated white employees were treated differently").  For example, Song named two foreign interns (one white and one apparently Asian) who experienced "similar issues" but who, unlike the plaintiff, "were given opportunities to remediate or repeat rotations."[14] The plaintiff identified a third.[15]  The suggestion that the plaintiff was treated differently from these individuals based on his race also finds support in Setnik's statement that "[i]t is hard to understand the underlying basis for [the negative] perceptions of [the plaintiff's] work."

---

[14] The defendants argue that Dr. Soon-Il Song's testimony is "inadmissible as opinion testimony."  We discern no basis for this argument, given that Song can testify about the treatment of these two interns from "personal knowledge." See Mass. G. Evid. § 602 (2016) (witness may testify if he or she "has personal knowledge of the matter"; evidence of that knowledge "may consist of the witness's own testimony").

[15] There was only one other intern not promoted from among the first-year residents in the plaintiff's cohort; that individual was black and from Uganda.  He was forced to leave the residency program when, following a poor evaluation from the hospital, his medical license was not renewed.

Third, Dvorak, an African-American internist and psychiatrist, described three separate instances of Caucasian doctors whose deficient performances she and other staff members noticed and brought to the attention of hospital administrators, but who were not subject to disciplinary action until months or years after the complaints were made -- and then only because of pressure from patients and other hospitals.  Dvorak also noted an incident in which she found "white supremacist" literature in the break room.  Although she told administrators "how upsetting [this] was, particularly [to her] as a[n] African-American," she maintains that the administrators rejected requests to discipline employees who displayed such literature in the workplace.[16]

Fourth, a reasonable jury could interpret a number of comments by the plaintiff's evaluators and supervisors as reflecting "[s]tereotypical thinking . . . categorizing people on the basis of broad generalizations."  Lipchitz, supra at 503

---

[16] The defendants contend that the entirety of Dr. Ramona Dvorak's testimony is inadmissible because it is "opinion testimony."  To the extent that Dvorak points to specific incidents and individuals of which she had personal knowledge, however, we discern no basis on which to exclude it.  See Mass. G. Evid. § 602.  That being said, the admissibility of any proffered evidence at trial is for the judge to determine.  See Commonwealth v. Drayton, 473 Mass. 23, 38 (2015) ("In identifying these elements that arguably may support" plaintiff's case, "we do not in any way suggest that the [evidence] ultimately is admissible").  See also Commonwealth v. Alcide, 472 Mass. 150, 162 n.14 (2015).

n.16. Although such statements in isolation would not be adequate to support a finding of discrimination, when considered with evidence of disparate or unfair treatment in the evaluation process, they may lend support to such a finding. See Conway v. Electro Switch Corp., 825 F.2d 593, 597 (1st Cir. 1987) ("While evidence of a discriminatory atmosphere may not be conclusive proof of discrimination against an individual plaintiff, such evidence does tend to add 'color' to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff").

For instance, one evaluator criticized the plaintiff for being "too confident for his own good." Another said that someone in the plaintiff's position as an "intern is not supposed to be smart" and "[t]hat is why all of this [criticism] is happening." Yet another, Bial, stated that the plaintiff was "the least respectful person with whom [she had] ever worked" and that he "has no capacity whatsoever for self-assessment." Bial also spoke negatively to other residents and interns about the plaintiff outside of the plaintiff's presence and "berated him" publicly in a manner that a witness identified as both not "appropriate" and unprecedented in his experience with Bial. Additionally, in informing the plaintiff of the decision not to promote him, Zinner noted that the plaintiff "is not well suited for a career in internal medicine in this country." These kinds

of comments can, of course, admit of different interpretations by a jury, including ones reflecting only untainted professional judgment.  One interpretation that a jury could make of such comments, however, is that, combined with Bial's behavior, they reflect a subconscious sense that the plaintiff, as a black man and a foreigner, did not "know his place."[17]  See Ash v. Tyson Foods, Inc., 546 U.S. 454, 456 (2006) (judgment as matter of law for employer inappropriate where employer used ambiguous term that, though "not always . . . evidence of racial animus," is not "always benign").

Fifth, there is evidence that the defendants did not follow their written procedures in deciding to terminate the

---

[17] In addition to these comments, which were made by the plaintiff's evaluators, some comments made during a meeting of the ad hoc committee might suggest that the plaintiff was evaluated critically in part because of his race.  Specifically, the doctors compared the plaintiff to a trainee from fifteen years earlier, whom they identified as a "woman of color from Washington" and who, like the plaintiff, had difficulty with "interpersonal skills, communication skills, [and] professionalism."  They said that this trainee "would have flunked on a number of those [more subjective] competencies" in which the plaintiff was deficient, despite the fact that she had no deficiencies in "intelligence and IQ."  A jury might see these comments as reflecting a tendency to evaluate black trainees unfavorably in subjective areas like interpersonal communication, even when those trainees perform well in objectively measurable areas like intelligence and medical knowledge.  See Douglas v. J.C. Penney Co., 474 F.3d 10, 14 (2007) (evidence of racial animus inferred from "disparities in subjective performance evaluations between employees of different races" when those subjective evaluations "did not correlate with the individualized objective performance factors for those employees").

plaintiff's employment. A "'failure to follow established procedures or criteria' . . . [may] support a reasonable inference of intentional discrimination." Nesbitt v. Holder, 966 F. Supp. 2d 52, 56 (D.D.C. 2013), quoting Brady v. Office of the Sergeant at Arms, 520 F.3d 490, 495 (D.C. Cir. 2008). See 1 A. Larson, Employment Discrimination § 8.04, at 8-81 to 8-82 (rev. ed. 2015) ("pretext can be shown by demonstrating . . . irregularities in . . . the procedures for discharge").

Here, the defendants departed from their written due process policy by failing to include a resident on the ad hoc committee, by not allowing the plaintiff to attend two of the three meetings of that committee, and by failing to heed the plaintiff's request for materials from those meetings. The defendants further departed from this policy when they immediately terminated the plaintiff's employment without having informed him, either before or after the ad hoc committee meeting, that this step was being considered.

The defendants argue that these five categories of evidence do not suffice to raise a question of material fact. They note that, even if all of the inferences drawn by the plaintiff from the above evidence were reasonable, the ad hoc committee conducted "an expanded review" of the CCC's decision to terminate his employment and "concluded that the [plaintiff's] deficiencies remained serious." Bulwer, supra at 355 (Sikora,

J., dissenting). A "third [party]'s independent decision to take adverse action," they argue, "breaks the causal connection between [any] retaliatory or discriminatory animus [harbored by the plaintiff's evaluators] and the adverse action." Mole v. University of Mass., 442 Mass. 582, 598 (2004). This argument is unavailing.

In addition to input from the plaintiff, the ad hoc committee based its conclusions on the evaluations relied on by the CCC, as well as on testimony from the physicians who wrote those evaluations and on statements and memoranda from the CCC itself. Where "the decision makers relied on the recommendations of supervisors [whose motives have been impugned], the motives of the supervisors should be treated as the motives for the decision. . . . An employer [may not] insulate its decision by interposing an intermediate level of persons in the hierarchy of decision, and asserting that the ultimate decision makers acted only on recommendation" (citation omitted). Trustees of Forbes Library v. Labor Relations Comm'n, 384 Mass. 559, 569-570 (1981). See Cariglia v. Hertz Equip. Rental Corp., 363 F.3d 77, 83 (1st Cir. 2004) ("liability can attach if neutral decision makers, when deciding to terminate an employee, rely on information that is inaccurate, misleading, or incomplete because of another employee's discriminatory animus").

The defendants also argue, in essence, that criticisms of the plaintiff's performance, even if harsh, are best read to reflect "professional" judgment rather than racial animus. Bulwer, supra at 350 (Sikora, J., dissenting). Even assuming the defendants are correct such that they could prevail on this point at trial, at the summary judgment stage "a court does not resolve issues of material fact, assess credibility, or weigh evidence." Kernan v. Morse, 69 Mass. App. Ct. 378, 382 (2007). The question of whose interpretation of the evidence is more believable, "raised by the [parties'] conflicting evidence as to the defendant[s'] motive, is not for a court to decide on the basis of [briefs and transcripts], but is for the fact finder after weighing the circumstantial evidence and assessing the credibility of the witnesses."[18] Lipchitz, supra at 499, quoting Blare, supra at 445.

---

[18] Our decision in Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34 (2005), is not to the contrary. In affirming summary judgment for the employer, we noted that the plaintiff there essentially conceded that the adverse employment action was motivated by her supervisor's perception of her performance as poor, as evidenced by the fact that she "[did] not challenge whether [the defendant] truly believed that her mishandling" of certain matters warranted her discharge. Id. at 57 (plaintiff did not present any "evidence . . . that [the defendant] selected her for layoff for any reason other than her own performance" and "[t]here [was] ample, uncontroverted evidence that the negative impression [plaintiff's supervisors] had formed of [plaintiff]'s abilities was a primary reason she was selected for layoff").

In this regard, summary judgment remains "a disfavored remedy in the context of discrimination cases based on disparate treatment . . . because the ultimate issue of discriminatory intent is a factual question" (citations omitted).[19] Blare, supra at 439. A defendant's motive "is elusive and rarely is established by other than circumstantial evidence," therefore "requir[ing] [a] jury to weigh the credibility of conflicting explanations of the adverse hiring decision."[20] Id. at 439-440.

c. Breach of contract claim. To prevail on a claim for breach of contract, a plaintiff must demonstrate that there was an agreement between the parties; the agreement was supported by consideration; the plaintiff was ready, willing, and able to perform his or her part of the contract; the defendant committed a breach of the contract; and the plaintiff suffered harm as a

---

[19] Because the plaintiff questions the legitimacy of his employer's motive in terminating his employment, "[t]his is a disparate treatment case[,] not a disparate impact case." See Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 439 n.3 (1995). See also Cox v. New England Tel. & Tel. Co., 414 Mass. 375, 384-385 (1993).

[20] See Clermont and Schwab, Employment Discrimination Plaintiffs in Federal Court: From Bad to Worse?, 3 Harv. L. & Pol'y Rev. 103, 128 (2009) ("pretrial adjudication particularly disfavors employment discrimination plaintiffs"). See also Donald and Pardue, Bringing Back Reasonable Inferences: A Short, Simple Suggestion for Addressing Some Problems at the Intersection of Employment Discrimination and Summary Judgment, 57 N.Y.L. Sch. L. Rev. 749, 752 (2012-2013) ("Federal Judicial Center has noted that '[s]ummary judgment motions by defendants are more common in [employment discrimination] cases [than in other civil actions], are more likely to be granted, and [are] more likely to terminate the litigation'").

result.  <u>Singarella</u> v. <u>Boston</u>, 342 Mass. 385, 387 (1961).  At issue here is the fourth element, i.e., whether the defendants committed a breach of the contract embodied in the medical resident agreement.

The plaintiff maintains that the defendants committed such a breach in five ways:  by failing to comply with the ACGME's nondiscrimination policy; by failing to include a resident on the ad hoc committee as required by the hospital's written procedures; by failing to advise the plaintiff, in advance, of certain items to be discussed by the ad hoc committee; by failing to provide him with the resources and supervision necessary to perform his job; and by failing to offer him an opportunity to appeal from the decision of the ad hoc committee.[21]  To prevail on a motion for summary judgment on these claims, the defendants must demonstrate that "there are no material facts in dispute."  <u>Somerset Sav. Bank</u> v. <u>Chicago Title Ins. Co</u>., 420 Mass. 422, 426 (1995).

---

[21] Although the complaint contained a general breach of contract claim, the motion judge declined to address directly any of these particular assertions because the specific grounds mentioned were first identified in the plaintiff's opposition to the summary judgment motion.  In its de novo review, the Appeals Court nonetheless addressed these claims, see <u>Bulwer</u>, <u>supra</u> at 333-334, apparently concluding that they were properly before the motion judge.  The Appeals Court noted, however, that the evidence does not support the plaintiff's contention that the defendants failed to offer him an opportunity to appeal from the ad hoc committee's decision.  See <u>Bulwer</u>, <u>supra</u> at 334 n.16.  We do not disagree.

     With regard to the first allegation, the defendants were
bound by the ACGME's nondiscrimination policy prohibiting
discrimination based on race or national origin.  This policy
was incorporated by reference in the medical resident agreement.
See Chicopee Concrete Serv., Inc. v. Hart Eng'g Co., 398 Mass.
476, 478 (1986) ("incorporation by a clearly stated general
reference will suffice").  Whether the defendants violated this
policy requires analysis of much the same evidence noted in our
discussion of the plaintiff's discrimination claim.  For similar
reasons, we conclude that the defendants have failed to
establish the absence of any issue of material fact with regard
to the assertion of a violation of the ACGME's nondiscrimination
policy.

     Turning to the second allegation -- failure to include a
resident on the ad hoc committee -- it is undisputed that the ad
hoc committee did not include a resident.  The inclusion of a
resident was required by the hospital's grievance policy, which
the hospital was to follow under the terms of the ACGME
requirements and thereby under the medical resident agreement as
well.  Although the defendants claim that the plaintiff was not
harmed by this failure to comply with the medical resident
agreement, that is a question of fact for the jury.

     It is also undisputed that the plaintiff was not invited to
the latter two meetings of the ad hoc committee and that the

defendants failed to notify the plaintiff, in advance of those meetings, that they were considering immediately terminating his employment.  There is also no indication in the record that the plaintiff was ever given any information about "additional" concerns cited by the committee regarding patient safety notwithstanding the plaintiff's request for pertinent information.  The hospital's grievance policy, however, requires that a resident receive from the department chair in advance of the meeting a "written statement of the specific issues [to be discussed at the meeting]."[22]  Although the defendants gave the plaintiff an opportunity to submit written rebuttal evidence, a reasonable jury could find that this was not equivalent to an opportunity to participate fully in the initial proceedings. They could also find that the plaintiff's lack of notice and diminished participation in the meetings reduced the effectiveness of his participation in those meetings and, accordingly, affected the outcome of the committee's deliberations.

The plaintiff contends further that the defendants failed to provide him, as required by the ACGME, with the "appropriate supervision" and "resources" necessary to perform his work.  In

---

[22] The policy also requires that all bases for the committee's decision "be introduced into evidence at the proceeding" and, more generally, that the resident will receive "a fair hearing."

this regard, the plaintiff has proffered evidence that his mentor did not hold weekly meetings with him as outlined in his remediation plan.  More generally, he points to evidence, detailed earlier, that he was not offered the same remediation opportunities as similarly situated peers, which could be construed as a failure to provide "appropriate supervision."[23]

3.  Conclusion.  The judgments in favor of the defendants on the plaintiff's claims for employment discrimination under G. L. c. 151B, § 4, and breach of contract are vacated and set aside.  The matter is remanded to the Superior Court for further proceedings consistent with this opinion.

So ordered.

---

[23] A jury could find that the plaintiff's lack of familiarity with hospital procedures, mentioned by Song in his deposition, could have resulted from the absence of close mentoring or supervision.