The plaintiff, Gerald N. Pellegrini, is a self-taught theoretical physicist, who claims to have discovered a means of extracting a virtually limitless source of energy from the ambient environment. Pellegrini's idea, for which he obtained various patents, is based on the theory that under some conditions, certain materials are able to convert energy from one form to another in a different measure than in the reverse direction. Such materials are said to have "unequal coupling coefficients." According to Pellegrini, the existence of unequal coupling coefficients theoretically could be exploited to allow a motor to operate by drawing heat from the ambient environment (thereby creating a form of perpetual motion machine). This theory is at odds with a generally-accepted tenet of physics known as the second law of thermodynamics.
Nian X. Sun, then an associate professor at Northeastern University, agreed to conduct experiments that Pellegrini hoped would support his claims regarding unequal coupling coefficients. That collaboration resulted in part in the publication of an academic article about the results of some of the experiments. Pellegrini, Sun, and others were listed as coauthors of the article.
Dissatisfied with both the substance of the article and the process used to produce it, Pellegrini brought a six-count amended complaint against Sun and Northeastern University. On cross motions for summary judgment, a Superior Court judge ruled in the defendants' favor for reasons he explained in a thoughtful and comprehensive memorandum of decision. Pellegrini brought a timely appeal limited to three of his counts: 1) a breach of the implied covenant of good faith and fair dealing, 2) fraud, and 3) G. L. c. 93A. We affirm.
Background.[3] Pellegrini graduated from college in 1967, after which he began, but never completed, a graduate course of study. For a time, he taught high school but otherwise never held a regular job. Nonetheless, he continued to pursue his interest in theoretical physics, and has had some success in the field, e.g., in publishing academic articles.
The summary judgment record reveals the difficulties that Pellegrini has had obtaining funding to develop his energy-harvesting ideas. This is unsurprising given that these ideas run against a fundamental tenet of physics, something that Pellegrini admits causes people to approach his ideas with "great skepticism."[4] In 2009, he did obtain funding for a round of experiments conducted at the University of Maryland, but the funding entity then went out of business. After much effort, he obtained $60,000 in funding from an individual investor named Barry Herring. That money was to be used to conduct tests to measure the coupling coefficients of certain materials at the Northeastern University laboratory run by Sun. Sun and Herring entered into a one-page memorandum of understanding to formalize the arrangement. Under that bare-bones contract, Sun agreed to "perform six months of fundamental studies to identify and exploit recently discovered discrepancies in coupling coefficients of various magnetostrictive, magnetoelectric, and multiferroic materials and composites," and Herring agreed to provide funding for that research.[5] The agreement makes no mention of publication of the results of any experiments conducted.
Two rounds of testing were performed by a postdoctoral researcher (postdoc) at Sun's lab. The first round, which was conducted from June, 2010, to the summer of 2011, looked at four different materials, including a composite that contained an iron gallium compound. Although there appeared to be a small discrepancy in the coupling coefficients for this composite, this fell within the margin of error, and the study eventually ruled out a documented discrepancy. Showing somewhat more promise was a different material known as "metglas." Initial testing showed an apparent twenty percent discrepancy in the coupling coefficients for metglas. However, further testing conducted during the first round ruled out metglas as a commercially viable option for Pellegrini's energy-harvesting idea.
The second round of experiments, conducted between October, 2011, and April, 2012, involved the testing of a pure rod of galfenol, an alloy of iron and gallium. This testing indicated an apparent discrepancy of as high as seventy-nine percent in the coupling coefficients for galfenol. Based on this testing, Pellegrini concluded that galfenol could be feasible for a practical application of his ideas. For his part, Sun was more skeptical of the results. He believed that the data was incomplete and that the measured discrepancies in coupling coefficients were likely caused by energy losses or other factors, rather than documenting an exception to the second law of thermodynamics.
Meanwhile, in the fall of 2010, Sun, the postdoc, and Pellegrini had begun to contemplate an article on the results of the initial phase of the experiments. The postdoc took the lead in drafting the article. His first draft, which was completed in March, 2011, focused in particular on the iron gallium composite examined in the first phase (which ultimately indicated no discrepancy in the coupling coefficients). A discussion ensued among the coauthors about the extent to which, if at all, the article should mention the apparent discrepancies regarding the metglas. Pellegrini wanted to reference such discrepancies, while Sun wanted to downplay them if they were mentioned at all. After extensive discussion by electronic mail messages (e-mail), Pellegrini and Sun agreed to reference the observed discrepancy for the metglas sample without stating what caused it, while adding language that "[a] new method that can characterize the origin of such discrepancy is being developed and will be reported later." With that drafting issue resolved, Pellegrini signed off on the version of the article shown to him in July of 2011.
Unbeknownst to Pellegrini, Sun and the postdoc made substantive revisions to the draft, including to the agreed-to statement about the metglas results. After the revised version was rejected by two journals, they also solicited a new, "big name" coauthor to boost the chances of publication (an idea that originally came from Pellegrini). The new author insisted on various changes of his own (with Pellegrini again not being included in the redrafting process despite his status as a nominal coauthor). The article was also revised into a short-form format known as a "brevia," and in January of 2012, it was accepted in that form by a journal known as Applied Physics Letters. Sun sent Pellegrini the accepted version of the article as an e-mail attachment, with a message stating that the journal had accepted the article "as is." Had Pellegrini opened the attachment or even read the chain of messages included in the e-mail, he readily would have seen that the article had been substantially revised.[6] However, in his cover e-mail, Sun did not highlight that changes had been made, and-claiming that he understood the "as is" reference to mean that the journal accepted the last version of the article that he had seen and approved six months earlier-Pellegrini did not scrutinize the e-mail further.
The article, reduced now to two pages, was published on March 9, 2012. Consistent with the initial drafts, its main focus was on the testing results for the composite material containing iron gallium (which indicated no discrepancy in the coupling coefficients, or at least none beyond the margin of error). However, the article went on to state that the testing also purported to "confirm" such equivalency for the metglas sample "in a separate study to be published elsewhere." In addition, the article appears to include some statements of seeming general applicability, suggestive that coupling coefficients will always be equivalent.[7] For example, the article closes by saying that the work "has practical relevance as it permits both converse and direct [magnetoelectric] coefficients to be determined even when only one can be measured conveniently."
Pellegrini did not read the article until after it was published. In his view, the published version raised two overlapping types of problems (both exacerbated by his being listed as a coauthor). First, he claimed that it specifically misstated the metglas data (assigning a purported cause for the observed discrepancy that had not been established). Second, he claimed that the article more generally undermined his theories by suggesting that coupling coefficients will always be equal. Pellegrini requested that Sun join him in seeking to have the journal "recall" the article, but Sun refused to do so.
Discussion. We begin by noting that Pellegrini's ire at how he was treated during the publication process is understandable. Sun specifically agreed to include negotiated language as to how the metglas data would be referenced in the article; if Sun in the end decided that he could not live with that language, the norms of the profession appear to dictate that, at a minimum, he expressly should have brought this to Pellegrini's attention before submitting the article purportedly on their joint behalf.[8]
However, the narrow question properly before us is not whether Pellegrini has a justification to be angry but whether he has a viable cause of action based on the theories articulated in his amended complaint. All three remaining claims share the common element that Pellegrini must prove his damages, an issue that the defendants squarely put in play through their motion for summary judgment. See Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991) ("[A] party moving for summary judgment in a case in which the opposing party will have the burden of proof at trial is entitled to summary judgment if he demonstrates by material described in Mass.R.Civ.P. 56(c), unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case"). We agree with the motion judge that Pellegrini offered nothing beyond speculation on this point, and we affirm the judgment in the defendants' favor on this ground.[9]
At the point that the article was published, Pellegrini had already determined that metglas did not present a commercially viable option. This remained true regardless of whether the twenty percent discrepancy observed during the first phase of the testing provided some support for his underlying theories (as Pellegrini hoped) or instead should be attributed to other causes (as Sun believed). Rather, by the time of publication, both Pellegrini and Sun had moved on from metglas to pure galfenol, a material that showed some promise. In this context, it is far from clear how the reporting of any specific results on metglas (whether accurate or not) could have had any material impact on Pellegrini (or Herring).
It is easier to imagine a pathway of potential harm if statements in the article are seen more generally as debunking Pellegrini's underlying theories. However, such harm would still need to be documented by admissible evidence. See Ng Bros. Constr., Inc. v. Cranney, 436 Mass. 638, 644 (2002) ("[S]ummary judgment is ... available if the party with the burden of proof at trial ... fails to present in the summary judgment record, taking everything it says as true and drawing all reasonable inferences in its favor, sufficient facts to warrant a finding in its favor"). Pellegrini failed to do this; instead, he improperly treated such harm as self-evident.[10] Thus, for example, although Pellegrini claims that the article made it harder for him to secure future funding to help develop his idea, he has provided no support for that contention. To the contrary, the record indicates no one but Herring was willing to fund the project before the article was published, and nothing changed on this front since the article was published. Similarly, while Pellegrini maintains that the article caused a sharp drop in the value of his intellectual property, there is nothing in the record to substantiate this beyond Herring's unsupported lay opinion that such property is "worth a lot less than before that paper was published."[11] Damages must be supported by more than mere speculation, see Squeri v. McCarrick, 32 Mass. App. Ct. 203, 209 (1992), and that proposition applies even at the summary judgment phase (where, as here, damages have been placed at issue).
Judgment affirmed.

In reviewing the grant of a motion for summary judgment, we examine the evidence in the record de novo, view the evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences in favor of the nonmoving party. Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 680 (2016), and cases cited.

Under the second law of thermodynamics, coupling coefficients are presumed to be equal for the same material.

The investor subsequently assigned all his rights under the memorandum to Pellegrini. The memorandum was extended twice, but not in writing, and the investor made two additional contributions of $60,000 each to fund the study.

In addition to attaching the version of the article that the journal had accepted, the e-mail that Sun sent to Pellegrini included comments from the new "big name" coauthor (indicating that the article had undergone substantive changes), and comments from the journal's reviewer about the title of the article (which focused on the "equivalence" of "the coupling coefficients in the iron gallium sample," not discrepancies in them).

Because this court lacks training in this highly technical field, it is difficult for us to discern the extent to which the statements included in the article properly should be read as being generally applicable. For purposes of our analysis, we have assumed this to be true.

The record includes a "statement of ethics" from the journal at issue here that states, in pertinent part, that "[t]he author who submits the paper for publication should ensure ... that all coauthors have seen the final version of the paper and have agreed to its submission for publication."

We assume arguendo that Pellegrini otherwise stated causes of action for a violation of the covenant of good faith and fair dealing, fraud, and a violation of G. L. c. 93A. Nothing in this memorandum and order should be interpreted as our having reached those issues.

In his written opposition to the defendant's motion for summary judgment, at the prolonged hearing on the summary judgment motions, and in his motion for reconsideration, Pellegrini made no argument that summary judgment should be delayed in order to give him time to complete discovery on damages. See Mass.R.Civ.P. 56(f), 365 Mass. 824 (1974). Any such argument therefore has been waived. Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co., 439 Mass. 387, 401 (2003).

At oral argument, Pellegrini cited to Menici v. Orton Crane & Shovel Co., 285 Mass. 499, 503-505 (1934), to support his argument that Herring properly could testify to the value of the patents at issue here. Menici discussed and followed a venerable line of cases in which an owner of real or personal property was allowed to testify to the value of that property. See, e.g., Shea v. Hudson, 165 Mass. 43, 45 (1895) ( "Ordinarily the owner of a horse and buggy may be presumed to have such familiarity with them as to know pretty nearly, if not actually, what they are worth"). Whatever the continued viability of such cases today is, we are unpersuaded that they render Herring's statements sufficient to survive summary judgment. Herring's bald statement that the patents were "worth a lot less" is unsupported by any adequate foundation.