NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporters@sjc.state.ma.us

19-P-962                                             Appeals Court


ANNE VACCA  vs.  THE BRIGHAM & WOMEN'S HOSPITAL, INC.


No. 19-P-962.

Suffolk.     May 13, 2020. - September 21, 2020.

Present:  Neyman, Englander, & Hand, JJ.


Contract, What constitutes, Validity, With hospital, Performance
    and breach, Implied covenant of good faith and fair
    dealing, Modification, Promissory estoppel.  Medical
    Malpractice.  Emotional Distress.  Hospital.  Negligence,
    Hospital, Emotional distress.  Practice, Civil, Summary
    judgment.


    Civil action commenced in the Superior Court Department on
August 4, 2016.

    The case was heard by Paul D. Wilson, J., on a motion for
summary judgment.


    Jeffrey S. Raphaelson for the plaintiff.
    Brian H. Sullivan (Rebecca A. Cobbs also present) for the
    defendant.


    NEYMAN, J.  This is an appeal from a summary judgment

issued by a judge of the Superior Court in favor of the

defendant, The Brigham & Women's Hospital, Inc. (BWH),[1] on claims including breach of contract, promissory estoppel, and intentional infliction of emotional distress.  In 2012, BWH agreed to provide free treatment to the plaintiff, Anne Vacca.  In 2016, Vacca brought this lawsuit after she became dissatisfied with the care she received.

The judge found that Vacca could not prevail on her claims because there was no evidence that BWH had committed a breach of any alleged promise it made to Vacca, BWH's conduct was not extreme and outrageous as a matter of law, and Vacca's claims should have been pleaded as malpractice claims.  We affirm.

Background.  1.  BWH agrees to treat Vacca.  Vacca has suffered from major depression for many years.  Despite treatment with various medications, psychotherapy techniques, and electroconvulsive therapy, her depression showed little improvement.

In 2011, Vacca's psychiatrist, Dr. Jane Erb, recommended treating her with deep brain stimulation (DBS).  The United States Food and Drug Administration has not approved DBS to treat depression, but the treatment is approved for other conditions such as Parkinson's disease.

---

[1] BWH is a charitable organization that provides medical care to patients at its hospitals and outpatient facilities, and engages in educational activities and scientific research.

DBS involves implanting electrodes within the brain.  The electrodes produce electrical impulses that can be directed to affect specific areas of the brain.  Implanting a DBS device requires brain surgery, which, in Vacca's case, would cost approximately $150,000.  The battery in the device needs periodic replacement, necessitating additional and expensive adjustments and surgeries.  There are also recurring costs to monitor the patient and program the DBS device.  Vacca's health insurance carrier refused to pay for DBS treatment, and Vacca was unable to pay for such treatment herself.  However, in 2012, Dr. Erb was the clinical director of the depression center at BWH.  On April 23, 2012, Dr. Erb sent a letter to Julia Sinclair, BWH's vice-president for clinical services, proposing that BWH provide free DBS treatment for Vacca.  Sinclair approved Dr. Erb's proposal.  Dr. Erb and Dr. Travis Tierney, the neurosurgeon who would perform Vacca's surgery, informed Vacca that BWH had agreed "to perform the surgery, provide the aftercare or the postoperative care, which included battery replacements, programming the device, and cover the costs as long as [she] needed that."

The parties did not discuss any further details of Vacca's treatment at that time.  They did not discuss the type of batteries that would be used in the device, who would program the device, or the possibility that Vacca might receive follow-

up care at another hospital. For its part, BWH contemplated that all postoperative and follow-up care would take place at its facility. The parties did not execute any written agreement.

There is evidence in the summary judgment record to suggest that BWH agreed to pay for Vacca's treatment not only because it wanted to help Vacca, but also because it wanted to expand its psychosurgery program. Indeed, BWH had recently recruited Dr. Tierney, who had experience using DBS to treat psychiatric conditions, with an eye towards growing the program. BWH later featured Vacca's case in promotional materials discussing the psychosurgery program.

On July 3, 2012, Dr. Tierney performed the implantation surgery. Thereafter, BWH provided Vacca with postoperative care, including surgeries to replace the device battery in 2013, 2014, and 2015. In 2014 and 2015, the parties discussed the pros and cons of rechargeable and standard batteries. BWH ultimately implanted a standard battery in all three battery replacement surgeries.

The DBS treatment proved successful. Vacca agreed that DBS had been "very helpful" in treating her depression. She also testified that she no longer had the disabling depression that she suffered prior to receiving the DBS treatment.

2. <u>The relationship sours</u>. By 2015, despite the success of her treatment, Vacca was dissatisfied with the care she was receiving. She outlined her concerns to BWH and to Dr. Erb, which included that the battery needed replacement more often than anticipated; that the most recent battery replacement had caused her to have problems sleeping; that her surgeon, Dr. Tierney, was leaving the hospital; and that BWH had not assigned a psychiatrist to program the DBS device.[2] Vacca was also unhappy with the decision to continue using standard batteries in the DBS device.[3] She requested that BWH transfer her care to another hospital.

BWH had some internal discussion regarding Vacca's concerns. Dr. Erb also had communications with Vacca, and on May 20, 2015, sent her an e-mail in which Erb stated that she was "doing everything possible to right the course of this and if that doesn't happen at BWH, then we'll make sure this happens

[2] Vacca discussed with Dr. John Sullivan and Dr. Tierney her concern "about the lack of psychiatric assessment and oversight related to programming of her stimulator." According to Dr. Sullivan's notes, Vacca "had been wondering whether, despite her clear response to the treatment, there were other adjustments that could be made to the DBS settings to optimize treatment and perhaps improve her response yet further." She also told Dr. Erb that she believed that a psychiatrist "should have been involved from the beginning" in programming her device and monitoring her response.

[3] Vacca told one doctor in 2014 that she did not want a rechargeable battery, but later that year Vacca said that she did want a rechargeable battery rather than a standard battery.

properly, and cover it, elsewhere." However, Dr. Erb did not have authority to agree to cover the cost of Vacca's care at another hospital.[4] BWH ultimately did not agree to pay for Vacca's treatment at another institution, but was willing to transfer Vacca's care at her own expense.

Around this same time, Vacca requested documentation of the 2012 "agreement." In response, BWH prepared a proposed letter agreement (letter agreement). The letter agreement stated that it would become effective on the date that Vacca signed it. Vacca refused to do so because she was unhappy with some of the terms, including a provision that allowed either party to terminate the letter agreement upon written notice. Vacca requested that her care be transferred to Massachusetts General Hospital (MGH), expressing the view that BWH lacked the expertise necessary to continue her treatment. BWH disagreed. BWH told Vacca that it was "confident" it could "provide the expert care [she] require[d]." However, BWH again offered to transfer Vacca's care at her own expense. For reasons explained in correspondence from MGH to Vacca, MGH did not agree to assume Vacca's care.

---

[4] Vacca does not contend on appeal that Dr. Erb had actual or apparent authority to bind BWH to pay for Vacca's treatment at a different hospital.

In October 2016, BWH performed another battery replacement surgery on Vacca.  Although Vacca has represented that she is no longer receiving treatment at BWH, BWH remains willing to provide DBS care for her.

3.  <u>The lawsuit</u>.  Vacca filed a complaint in Superior Court alleging breach of contract, misrepresentation, violation of G. L. c. 93A, intentional infliction of emotional distress, and promissory estoppel.  At the close of discovery, BWH moved for summary judgment on all claims.  The judge allowed the motion, and judgment entered for BWH.  Vacca timely appealed.

On appeal, Vacca presses only the breach of contract, promissory estoppel, and intentional infliction of emotional distress claims.  She first argues that a jury could find that BWH committed a breach of its promise to pay for her care by implanting a standard battery, rather than a rechargeable battery, in 2015; refusing to pay for her care at another institution; sending the letter agreement in 2015; and failing to ensure independent ethical oversight of her treatment.  She next argues that these claims do not sound in medical malpractice because her treatment was experimental and because BWH made certain care decisions for financial reasons.  Finally, she contends that her intentional infliction of emotional distress claim should survive summary judgment because a jury

could find it extreme and outrageous that BWH abandoned her care for financial reasons.

Discussion. We review a grant of summary judgment de novo to determine whether, viewing the evidence in the light most favorable to the nonmoving party, "all material facts have been established and the moving party is entitled to judgment as a matter of law" (citation omitted). Casseus v. Eastern Bus Co., 478 Mass. 786, 792 (2018). See Mass. R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002). See also Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).

1. Breach of contract claim. We first consider whether there were triable issues that precluded summary judgment on the breach of contract claim. "To prevail on a claim for breach of contract, a plaintiff must demonstrate that there was an agreement between the parties; the agreement was supported by consideration; the plaintiff was ready, willing, and able to perform his or her part of the contract; the defendant committed a breach of the contract; and the plaintiff suffered harm as a result." Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 690 (2016). See Singarella v. Boston, 342 Mass. 385, 387 (1961). Here, even assuming that a jury could find that the parties entered into an oral contract related to Vacca's DBS treatment, there is no evidence that BWH committed a breach of that contract.

a.  Contract formation.  The parties dispute whether their discussions about the cost of Vacca's DBS treatment resulted in the formation of a contract.  Thus, we begin by reviewing the relevant principles of contract law, which we recently summarized in Sea Breeze Estates, LLC v. Jarema, 94 Mass. App. Ct. 210, 215 (2018):

> "Contract formation requires a bargain in which there is a manifestation of mutual assent to the exchange.  This manifestation of mutual assent, otherwise known as a meeting of the minds, occurs when there is an offer by one [party] and an acceptance of it by the other.  [A]n offer is a manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.  Acceptance exists where the offeree assents to the offer in the terms in which it is made."  (Quotations and citations omitted.)

"[I]t is essential to the existence of a contract that its nature and the extent of its obligations be certain."  Caggiano v. Marchegiano, 327 Mass. 574, 579 (1951).  Where an alleged agreement "is silent as to material matters important in its interpretation for the ascertainment of the obligations of the parties," the contract may be too indefinite to enforce (citation omitted).  Held v. Zamparelli, 13 Mass. App. Ct. 957, 958 (1982).  "Nevertheless, '[i]t is not required that all terms of the agreement be precisely specified' so long as the material terms are ascertainable" (citation omitted).  JPMorgan Chase & Co. v. Casarano, 81 Mass. App. Ct. 353, 356 (2012).

Here, BWH argues that the parties' discussions about DBS were too indefinite to lead to the formation of a binding contract. Although the parties discussed BWH's willingness to pay for Vacca's DBS implantation and aftercare, the details of the arrangement remained open. The parties did not, for example, discuss the type of battery to be used in the device, whether Vacca could receive treatment at another facility, or how they would resolve disputes that might arise.

Vacca responds that a jury could find that the parties reached an oral agreement as to the terms the parties did discuss. Specifically, BWH would perform Vacca's DBS surgery and provide her aftercare at no cost to Vacca. Viewing the evidence in the light most favorable to Vacca, as we must, we conclude that there is evidence of a "manifestation of mutual assent to the [parties'] exchange" (citation omitted). Sea Breeze Estates, LLC, 94 Mass. App. Ct. at 215. See Brewster Wallcovering Co. v. Blue Mountain Wallcoverings, Inc., 68 Mass. App. Ct. 582, 596 (2007) ("Except where the evidence is undisputed or consists solely of writings, whether a contract was intended to be formed, what were its terms, and whether it was supported by consideration are issues of fact for determination by the jury").

Having concluded that there is sufficient evidence of a meeting of the minds to survive summary judgment, we next

address whether there was consideration for BWH's promise to provide free DBS care.  See Vasconcellos v. Arbella Mut. Ins. Co., 67 Mass. App. Ct. 277, 280 (2006) ("An oral contract, like any other, requires an offer, acceptance, and consideration"). There was evidence in the record that BWH benefited from the arrangement because it hoped to establish a DBS program for the treatment of depression.  BWH used Vacca's case in promotional materials in the hopes of attracting both qualified doctors and future patients for the program.  This evidence was sufficient to create a triable issue whether there was valid consideration for the parties' agreement.  See Sewall-Marshal Condominium Ass'n v. 131 Sewall Ave. Condominium Ass'n, 89 Mass. App. Ct. 130, 134 (2016), quoting Newhall v. Paige, 76 Gray 366, 368 (1858) ("The law does not undertake to determine the adequacy of a consideration. . . .  It is sufficient if the consideration be of some value, though slight, or of a nature which may enure to the benefit of the party making the promise").

b.  The alleged breaches.  Although a jury could find that the parties formed an oral contract, Vacca's breach of contract claim fails because she cannot establish that BWH committed any breach.  The undisputed evidence shows that BWH provided DBS treatment to Vacca at no cost from 2012 until after Vacca filed this action.  Though Vacca represented at oral argument that she has now transferred her care to another institution, it is

undisputed that BWH remains willing to care for her.  BWH thus has complied with all of the agreed terms of the contract.

Vacca nonetheless argues that BWH committed a material breach of the agreement by (1) implanting a standard battery, rather than a rechargeable battery, in 2015; (2) refusing to pay for the plaintiff's care at another institution; (3) failing to ensure independent ethical oversight for her care; and (4) sending her a letter agreement in 2015 that contained terms to which the parties had not agreed.  None of this conduct constitutes the commission of a breach of any material term of the parties' oral contract.  Indeed, there is no evidence to suggest that the parties discussed the type of battery to be used in the DBS device, the possibility of treatment at a facility other than BWH,[5] or how Vacca's care would be monitored before they entered into their oral contract in 2012.  Insofar as there was no evidence of a meeting of the minds regarding the terms now specified by Vacca, there was also no breach of such alleged terms.

Lacking proof that BWH committed a breach of any express term of the oral contract, Vacca argues that a jury could find that BWH committed a breach of the covenant of good faith and fair dealing implied in all contracts in Massachusetts.  Relying

---

[5] See note 4, supra.

on Tufankjian v. Rockland Trust Co., 57 Mass. App. Ct. 173, 177 (2003), she emphasizes that the 2015 letter agreement prepared by BWH constituted an attempt to exploit her position and force her to relinquish rights she otherwise had under the oral contract.

The implied covenant provides "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . . ." Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471-472 (1991), quoting Drucker v. Roland Wm. Jutras Assocs., 370 Mass. 383, 385 (1976). Because "the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties," it may not be "invoked to create rights and duties not otherwise provided for in the existing contractual relationship." Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004). Here, Vacca received the benefit of her bargain: free DBS surgery and aftercare. She cannot use the implied covenant to impose additional obligations on BWH beyond those to which the parties agreed.

We agree that there may be circumstances where actions by one party to a contract designed "to recapture opportunities forgone on contracting . . . and to secure a better deal from [the other party]" could constitute a breach of the implied

covenant (quotation and citation omitted). Tufankjian, 57 Mass. App. Ct. at 178. However, Vacca's reliance on Tufankjian is misplaced. In that case, a bank that had agreed to finance a portion of the purchase of an automobile dealership took steps to undermine the borrower's ability to obtain financing for the remainder of the purchase, including making disparaging statements about the borrower to the other lender and delaying an appraisal. Id. at 177-178. The bank then attempted to capitalize on the desperate situation it had created by offering to finance the entire purchase at rates that greatly exceeded the agreed rates. Id. at 178.

Here, BWH's reasons for drafting the letter agreement and its conduct after Vacca rejected that agreement differ from the bank's bad faith conduct in Tufankjian. It is undisputed that BWH prepared the letter agreement in response to Vacca's request for written documentation of the oral contract the parties had reached several years earlier. When Vacca refused to sign the letter agreement because it contained terms to which she had not agreed, BWH did not attempt to coerce her into signing. Instead, it continued to provide free medical care consistent with the oral contract. In this context, the letter agreement, at most, was as an attempted, and unsuccessful, modification of the parties' oral contract. See Sea Breeze Estates, 94 Mass. App. Ct. at 216, 217 (discussing requirements for written and

oral modification of contract and concluding that no modification was made where appellant "presented no evidence that the parties expressly agreed to the 'material terms' of a modification"). The evidence in the summary judgment record does not support the claim that the letter agreement was an improper attempt to coerce Vacca into forgoing her contractual rights.

c. Malpractice preemption. Of final note, with respect to Vacca's breach of contract claim, most of the alleged breaches she raised sound in medical malpractice and, as a matter of law, cannot be disguised or recast as a breach of contract claim. In Massachusetts, "[e]very action for malpractice, error or mistake against a provider of health care" is subject to certain procedural requirements. G. L. c. 231, § 60B. See G. L. c. 231, §§ 60C-60I. Further, where a malpractice claim is brought against a "nonprofit organization providing healthcare," such as BWH here, damages are capped at $100,000. G. L. c. 231, § 85K. A plaintiff may not circumvent this statutory scheme by "restat[ing] a claim, otherwise subject to the medical malpractice act, as [another type of claim]." Darviris v. Petros, 442 Mass. 274, 283 (2004). In other words, a judge faced with a claim against a health care provider must look at the substance of the plaintiff's allegations, rather than the label on the cause of action, to determine if the claim is a

malpractice claim.  Id.  See Roukounakis v. Messer, 63 Mass. App. Ct. 482, 487 (2005) (where "crux" of plaintiff's claim was "failure properly to diagnose," plaintiff's claim was for medical negligence).  Claims that challenge the "medical judgment exercised by the defendant physicians" are malpractice claims subject to the requirements for and limitations on such claims.  Vasa v. Compass Med., P.C., 456 Mass. 175, 178 (2010) (claim by third party injured by patient driving while under influence of medication sounded in malpractice because it involved defendant's medical judgment in determining whether to give certain warnings to patient about medication).  Cf. Morgan v. Laboratory Corp. of Am., 65 Mass. App. Ct. 816, 821-822 (2006) (claim for failure to convey test results to patient did not sound in malpractice because error was administrative and did not involve medical judgment).

Here, Vacca's concerns about BWH's failure to use rechargeable batteries in the DBS device, the qualifications of the psychiatrist programming the device, and the lack of ethical oversight of her treatment all challenge BWH's medical judgment. That the vast majority of Vacca's claims sound in medical malpractice is underscored by her description of her concerns, which she repeatedly couches in terms of BWH's alleged failure to comply with relevant "scientific and ethical standards" to ensure medically optimal results.

Vacca further argues that her breach of contract claim should survive because malpractice does not provide a remedy for BWH's alleged failure to pay for her care.  This claim fails for the reasons stated in the breach of contract discussion, supra: BWH upheld its end of the bargain by providing DBS treatment to Vacca at no cost from 2012 until after Vacca filed this action, and by remaining willing to care for her.[6]

2.  Promissory estoppel claim.  Vacca's promissory estoppel claim fails for substantially the same reasons as her breach of contract claim.  "Promissory estoppel is an equitable doctrine" that "[i]n the absence of a contract in fact, . . . implies a contract in law."  Malden Police Patrolman's Ass'n v. Malden, 92 Mass. App. Ct. 53, 60 (2017), quoting Barrie-Chivian v. Lepler, 87 Mass. App. Ct. 683, 686 (2015).  To prevail on a claim for promissory estoppel, a plaintiff must establish that (1) the

_____

[6] Vacca also argues that she is not challenging the medical judgment of any doctor but, rather, BWH's financial decision not to pay for elements of her care.  Vacca cites no authority for the proposition that a health care provider loses the protection of the medical malpractice statutory regime if it takes financial considerations into account when making treatment decisions.  Indeed, some cases have drawn a distinction between claims related to a provider's exercise of its medical judgment and claims arising from purely administrative or entrepreneurial aspects of a medical business, such as advertising or billing. See Darviris, 442 Mass. at 279 (discussing availability of G. L. c. 93A claims against health care providers); Morgan, 65 Mass. App. Ct. at 821-822.  The latter typically do not sound in medical negligence.  In any event, we need not resolve this issue here, in view of the absence of any evidence of a breach of the oral contract.

defendant made "a promise which [it] should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the [plaintiff], (2) the promise does induce such action or forbearance, and (3) injustice can be avoided only by enforcement of the promise." Loranger Constr. Corp. v. E.F. Hauserman Co., 6 Mass. App. Ct. 152, 154, S.C., 376 Mass. 757 (1978). In the present case, BWH at most promised to provide DBS care to Vacca at no cost. Where BWH did not commit a breach of that promise, Vacca is no more entitled to enforce the promise equitably than she is to enforce it at law.

3. Intentional infliction of emotional distress claim. Vacca contends that a jury could find BWH liable for intentional infliction of emotional distress because, upon determining that it could not build a successful DBS program for depression treatment, BWH sought to minimize the expense of Vacca's care, such as implanting a standard battery and discussing removal of the DBS device. To prevail on this claim, Vacca must prove "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was 'extreme and outrageous,' was 'beyond all possible bounds of decency' and was 'utterly intolerable in a civilized community'; (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the

plaintiff was 'severe' and of a nature 'that no reasonable man could be expected to endure it'" (citations omitted).  Agis v. Howard Johnson Co., 371 Mass. 140, 144-145 (1976).  She has not done so.

BWH's actions do not constitute the sort of extreme and outrageous conduct that would allow Vacca to recover for intentional infliction of emotional distress.  BWH's alleged wrongdoing arose in the context of its oral agreement to provide hundreds of thousands of dollars in free care to a patient who otherwise could not afford treatment.  Even putting "as harsh a face on [BWH's] actions . . . as the basic facts would reasonably allow," Zaleskas v. Brigham & Women's Hosp., 97 Mass. App. Ct. 55, 68 (2020), quoting Richey v. American Auto. Ass'n, Inc., 380 Mass. 835, 839 (1980), no jury could find it utterly intolerable in a civilized society for BWH to discuss alternative treatment options with Vacca, to take cost into account in determining what treatment to provide, or to refuse to pay for her treatment at another hospital (without interfering with her ability to transfer her care at her own expense).  See, e.g., Sena v. Commonwealth, 417 Mass. 250, 263 (1994) (upholding judge's ruling on summary judgment that

"alleged conduct was, as a matter of law, not extreme and outrageous").[7]

For the foregoing reasons, we conclude that the judge properly entered summary judgment in favor of BWH.

Judgment affirmed.

---

[7] We also note that no jury could find that BWH's proposal of the letter agreement, containing some terms viewed by Vacca as unfavorable, was beyond the bounds of decency where the evidence shows that BWH continued to provide free care to Vacca after she refused to sign the letter agreement.  Cf. Zaleskas, 97 Mass. App. Ct. at 68 (finding triable issue as to extreme and outrageous conduct where there was evidence that X-ray technician knew patient was in great pain, but did not allow family into examination room, refused to stop examination despite patient's screams, returned patient to a soiled bed, and lied about what had happened); Boyle v. Wenk, 378 Mass. 592, 593-595 (1979) (conduct of private investigator repeatedly harassing woman just released from hospital with newborn baby was extreme and outrageous).